IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA,
*Appellee,*

*v.*

SAMMANTHA LUCILLE REBECCA ALLEN,
*Appellant.*

No. CR-17-0368-AP
Filed July 26, 2022

Appeal from the Superior Court in Maricopa County
The Honorable Teresa Sanders, Judge
No. CR2011-138856-003
**AFFIRMED IN PART, VACATED IN PART, AND REMANDED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, Jeffrey Sparks, Acting Chief Counsel, Capital Litigation Section, W. Scott Simon (argued), Assistant Attorney General, Phoenix, Phoenix, Attorneys for State of Arizona

Treasure VanDreumel (argued), Law Office of Treasure VanDreumel, PLC, Phoenix, Phoenix, Attorney for Sammantha Lucille Rebecca Allen

JUSTICE LOPEZ authored the opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES BOLICK, BEENE, KING, and PELANDER (RETIRED)[*] joined.

---

[*] Justice William G. Montgomery has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable John Pelander, Justice of the Arizona Supreme Court (Ret.), was designated to sit in this matter.

_____

JUSTICE LOPEZ, opinion of the Court:

¶1 This appeal arises from Sammantha Lucille Rebecca Allen's convictions and sentences for the abuse and murder of A.D., Sammantha's ten-year-old cousin. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031, -4033(A)(1).

## BACKGROUND

¶2 Around the summer of 2010, Sammantha, her husband, John, and their four children moved into a house rented by Sammantha's mother, Cynthia. Sammantha and John were part of a large family that drifted through the residence at West Romley Street. Other residents included Judith, Sammantha's grandmother; David, Sammantha's uncle; Kassandrea, Sammantha's cousin; A.D., the ten-year-old victim; and C.J. and D.D., A.D.'s older siblings. Cynthia had legal guardianship over A.D., C.J., and D.D.

¶3 In the home, there was a thirty-one-inch-long storage box ("the box") which C.J. at one point used to store her Barbie doll collection. Beginning in the spring of 2011, Sammantha, John, Cynthia, and David began placing A.D. in the box as a form of punishment, even though A.D. barely fit inside because its length was twenty-one inches shorter than her height.

¶4 On July 11, 2011, Judith rewarded C.J. and A.D. with a popsicle for completing their chores. That evening, C.J. heard John yelling at A.D. for stealing a popsicle. As punishment, Sammantha and John forced A.D. to stand against a wall with her hands up and her head held away—a standard form of punishment the Allens called "wall stands." When C.J. came out of her room for dinner around 7:30 p.m., she saw that the Allens were still punishing A.D. by forcing her to do backbends, and that A.D. was crying and exclaiming that she was in pain. When C.J. went to bed around 9:00 p.m., A.D. was still crying and doing backbends.

¶5          As Sammantha and John continued punishing A.D. into the night, A.D. was ordered to drag the box from the patio into a room inside the house known as the classroom.[1]  Because the box's latch was known to be unreliable, John went to get a padlock—which only he had the key to—while Sammantha waited with A.D. and obstructed the classroom's only exit.  John returned and, with Sammantha standing by, ordered A.D. into the box, closed the lid, and locked it.  The Allens then went to their bedroom and fell asleep, leaving A.D. contorted inside the locked box—in a non-air-conditioned room in Phoenix during the summer—where she asphyxiated and died.

¶6          Phoenix Police Department ("PPD") Officer Albert Salaiz responded to a 911 call about an injured child and arrived at the West Romley home at approximately 8:30 a.m. on July 12, 2011.  Salaiz entered a room where a woman was performing chest compressions on A.D., who was lying on the floor on a towel.  Officers recorded the ambient temperature in the classroom at about 95°F and the box's interior at approximately 97°F.  A.D. was lying in a curled position, her lips were discolored, and she appeared to be dead.

¶7          John told Salaiz that A.D. and the other children had been playing hide-and-seek the night before, and that he had fallen asleep and found A.D. in the box that morning.  Childhelp, a nonprofit organization, later interviewed C.J., who reiterated the hide-and-seek story.  At trial, however, C.J. admitted she lied about that story because her family told her to perpetuate it.

¶8          Officers first learned A.D.'s death might have been a crime when Kassandrea and her boyfriend, Travis, as well as her aunt, Deborah, contacted police to report witnessing prior abuse of A.D., including confinement in the locked box.  Consequently, on July 27, 2011, Sammantha and John were arrested and questioned.

¶9          During her interview, Sammantha initially told the hide-and-seek story.  Although she admitted that John had previously confined A.D. in the box, Sammantha claimed she did not know whether he had done so on the night of A.D.'s death.

---

[1]     The "classroom" was a converted garage/carport that did not have air-conditioning, unlike the rest of the home.

3

¶10           After his initial interview with Sammantha, Detective Greg McKay allowed Sammantha and John to speak alone in an interview room. As they spoke, officers monitored their conversation. John told Sammantha that he had confessed and wanted to take full responsibility so she could remain with their four children. Sammantha tried to comfort John with the notion that "the only thing they're going to nail [her] with is child abuse." Both lamented that they had not "stuck with the story," but Sammantha explained that interviewing officers already knew they were lying.

¶11           McKay then resumed Sammantha's interview by confronting her about the monitored conversation with John and telling her that he knew both she and John were there when A.D. was locked in the box. During that interview, Sammantha admitted that (1) she and John forced A.D. to bring the box in from the patio; (2) while John retrieved the padlock, she stayed with A.D. and stood in the doorway, which was the only exit from the classroom; (3) after John returned with the padlock, A.D. was ordered into the box; (4) after A.D. entered the box, John closed the lid and locked it shut as Sammantha stood by; and (5) after John locked A.D. inside, the Allens laid down in their bedroom, and John rubbed Sammantha's head while she complained that A.D. was a difficult child until she fell asleep. Although Sammantha claimed she asked John to release A.D. from the box, she admitted she never attempted to release A.D. and fell asleep without ensuring A.D. was released.

¶12           The State charged Sammantha with murder and other felonies and sought the death penalty. John was also charged with murder, convicted, and sentenced to death. This Court affirmed John's sentence on appeal. *State v. Allen*, 248 Ariz. 352, 357 ¶ 1 (2020). A jury convicted Sammantha of first degree felony murder (Count 1), conspiracy to commit child abuse (Count 2), and three counts of child abuse (Counts 3–5). After considering the mitigating and aggravating circumstances, the jury determined that Sammantha should be sentenced to death. The court then imposed the death sentence on the murder conviction, and maximum and aggravated terms of imprisonment on the remaining counts. Sammantha appeals both the judgments and sentences.

## DISCUSSION

### A. Admission of Allegedly Prejudicial Evidence

¶13        Sammantha argues that her trial was fundamentally flawed because the trial court erroneously admitted statements made by her, John, and Detective McKay while she and John were in police custody.  We review the admission of testimony for an abuse of discretion but apply a fundamental error standard to testimony admitted without objection.  *See State v. Goudeau*, 239 Ariz. 421, 457 ¶ 144 (2016).  Reversal under fundamental error review requires the defendant to show that "(1) error exists, (2) the error is fundamental, and (3) the error caused [her] prejudice."  *State v. Riley*, 248 Ariz. 154, 170 ¶ 24 (2020).  To establish fundamental error, the defendant must show: "(1) the error went to the foundation of the case, (2) the error took from the defendant a right essential to [her] defense, *or* (3)  the error was so egregious that [she] could not possibly have received a fair trial."  *State v. Escalante*, 245 Ariz. 135, 142 ¶ 21 (2018).  Errors fitting into categories one or two require a separate showing of prejudice, but errors in category three are automatically prejudicial.  *Id.*

#### 1.  Admission of Sammantha's Statements

¶14        Sammantha argues the trial court erred in admitting her statements to McKay because they were the fruit of an illegal seizure, as neither probable cause nor a warrant existed for her arrest.

¶15        Because Sammantha failed to raise this claim at trial, she forfeited it, absent fundamental, prejudicial error.  Arizona Rule of Criminal Procedure 16.1 requires parties to make all motions before trial and mandates preclusion "unless the basis thereof was not then known, and by the exercise of reasonable diligence could not then have been known, and the party raises it promptly upon learning of it."  Ariz. R. Crim. P. 16.1(b)– (c)[2]; *see also State v. Bush*, 244 Ariz. 575, 588 ¶¶ 49–51 (2018) (finding defendant forfeited voluntariness challenge to an admitted confession by failing to move to suppress, request a hearing, or object to admission during trial).  Sammantha acknowledges her failure to object or seek suppression of her statements to McKay and does not argue this failure resulted from

---

[2]        Unless otherwise indicated, we cite to the version of rules and statutes in effect at the time of trial.

evidence that "was not then known" or that "could not then have been known" with "reasonable diligence." *See* Ariz. R. Crim. P. 16.1(c). Thus, she forfeited any argument over the admission of her statements, and we review only for fundamental error.

**¶16** Under fundamental error review, Sammantha must show her arrest was unlawful. *See Riley*, 248 Ariz. at 170 ¶ 24. Because PPD arrested Sammantha without a warrant, the arrest must be supported by probable cause. *See* A.R.S. § 13-3883(A)(1).

**¶17** "A police officer has probable cause when reasonably trustworthy information and circumstance would lead a person of reasonable caution to believe that a suspect has committed an offense." *State v. Hoskins*, 199 Ariz. 127, 137–38 ¶ 30 (2000). The probable cause standard "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *State v. Sisco*, 239 Ariz. 532, 536 ¶ 15 (2016) (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)). To determine whether probable cause was established, we consider "the collective knowledge of law enforcement officers at the time of arrest." *State v. (Raymond V.) Morris*, 246 Ariz. 154, 157 ¶ 9 (App. 2019).

**¶18** Sammantha's arrest was supported by probable cause. She does not dispute the facts known to PPD prior to her arrest. On July 12, 2011, officers called to the West Romley house found A.D.'s body lying beside a box. Family members at the scene alleged that A.D. was discovered in the box that morning due to a hide-and-seek accident. Sammantha and John were supervising A.D. the previous night. Later, the preliminary autopsy confirmed that A.D. died from suffocation and overheating, and Kassandrea, Travis, and Deborah reported A.D.'s ongoing abuse at the West Romley house. Deborah stated that on separate occasions she saw A.D. placed in the box, forced to eat hot sauce, beaten, sleeping in a shower stall, and having feces placed on her. Moreover, Deborah made a confrontation call to Cynthia in which Cynthia confirmed that A.D. was punished by confinement in the box. Travis reported witnessing Cynthia sitting on the box while A.D. screamed from inside before A.D. emerged from the box "extremely sweaty." Finally, Kassandrea reported seeing Sammantha and John force A.D. into the box on prior occasions.

**¶19** All the foregoing supported a reasonable belief that criminal activity—i.e., the abuse and murder of A.D.—had taken place, and that

Sammantha and John were involved. Because Sammantha's arrest was supported by probable cause, her post-arrest statements were properly obtained, and the court did not err in admitting them.

### 2. Admission of John and Sammantha's Conversation

¶20 Sammantha argues that the trial court erred by denying her motion to suppress her conversation with John in the interrogation room because monitoring it violated the Fourth Amendment. In reviewing a suppression order, "we consider only the evidence presented at the suppression hearing and view that evidence in a light most favorable to upholding the [trial] court's ruling." *State v. Lietzau*, 248 Ariz. 576, 579 ¶ 8 (2020).

¶21 The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." A person has a legitimate expectation of privacy protected by the Fourth Amendment "when an individual 'seeks to preserve something as private' and that expectation is 'one that society is prepared to recognize as reasonable.'" *State v. Mixton*, 250 Ariz. 282, 286 ¶ 13 (2021) (quoting *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018)).

¶22 Although Sammantha's subjective expectation of privacy is relevant, the trial court correctly concluded that it is not one society would recognize as reasonable. When an individual is in custody, the reasonableness of any expectation of privacy is reduced and less likely to be recognized by society. *See Maryland v. King*, 569 U.S. 435, 462 (2013) ("The expectations of privacy of an individual taken into police custody 'necessarily are of a diminished scope.'" (alteration omitted) (quoting *Bell v. Wolfish*, 441 U.S. 520, 557 (1979))); *United States v. Savage*, 482 F.2d 1371, 1372–73 (9th Cir. 1973) ("[W]hat society recognizes as a reasonable expectation of privacy is restricted when the individual asserting the expectation is incarcerated or in custody."); *cf. Lanza v. New York*, 370 U.S. 139, 143–45 (1962) (concluding jail visitor room was not a protected area). Police stations are often monitored for security purposes, *see State v. Hauss*, 142 Ariz. 159, 162 (App. 1984), and interview rooms generally contain recording equipment.

¶23 Here, Sammantha was under arrest in an interview room in a police station when she was permitted to speak to John. PPD monitors its

interview rooms for the safety of its officers and others in its custody, and McKay told John that officers would be watching him and Sammantha to ensure they did not hurt one another. PPD's legitimate security interest in monitoring and recording its interview rooms, along with the common knowledge that these rooms are being monitored, extinguished any already diminished expectation of privacy Sammantha had while in custody.

**¶24** Sammantha also contends that the marital communications privilege supports her expectation of privacy. But in Arizona this "privilege applies only to confidential communications," *State v. Drury*, 110 Ariz. 447, 454 (1974), which cannot occur in a police interview room. The court did not abuse its discretion by admitting Sammantha's in-custody conversation with John.

### 3. Admission of John's Statements

**¶25** Sammantha argues that the trial court erred by failing to suppress John's statements as irrelevant and inadmissible hearsay, and it committed fundamental error by not sua sponte issuing a limiting instruction.

**¶26** At trial, Sammantha moved in limine to preclude admission of John's statements to her in the interview room, alleging that admitting them would violate the Sixth Amendment Confrontation Clause or the Arizona Rules of Evidence. The trial court ruled that the challenged statements were not hearsay because they were not offered to prove the truth of the matters asserted. Instead, they were offered to place Sammantha's statements in context and show her responses and reactions to John's statements. Although the trial court denied the motion, it did redact statements deemed irrelevant or prejudicial.

**¶27** Hearsay is defined as a statement "the declarant does not make while testifying at the current trial or hearing" that is "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Ariz. R. Evid. 801(c). Statements "offered for a purpose other than [proving] the truth of the matter asserted" are not hearsay. *State v. Larson*, 222 Ariz. 341, 345 ¶ 21 (App. 2009). For instance, an "out-of-court statement [admitted] for the purpose of establishing what effect it had on the listener"

is not hearsay.  *United States v. Lopez*, 913 F.3d 807, 826 (9th Cir. 2019)[3]; *cf. State v. Boggs*, 218 Ariz. 325, 335 ¶ 41 (2008) (concluding that officers' statements during interrogations are not hearsay if admitted to provide context for a defendant's responses).  Further, "words or conduct not intended as assertions are not hearsay even when offered as evidence of the declarant's implicit belief of a fact."  *State v. Chavez*, 225 Ariz. 442, 444 ¶ 8 (App. 2010).

**¶28**        In *State v. Forde*, 233 Ariz. 543, 563 ¶ 73 (2014), the defendant objected to the admission of a text message that read: "cops on scene, lay low."  We concluded that the text "was not hearsay because the State did not introduce it to prove the truth of the matter asserted — that the cops were on the scene," rather the State introduced it "to show that [the accomplice] was communicating concerns about police activity at the victims' home to someone he thought would share his concerns, thereby constituting circumstantial evidence of the other person's involvement."  *Id.* at 564 ¶ 78.

**¶29**        Here, as in *Forde*, the State did not introduce the statements to prove their truth but rather to establish Sammantha's evolving story about the circumstances of A.D.'s death.  Thus, the court acted within its broad discretion to admit John's statements for non-hearsay purposes—i.e., to show Sammantha's reactions to John's statements and actions and to put her own statements in context.

**¶30**        Although Sammantha claims that John's statements *were* used to prove the truth of the matters asserted, this is unsupported by the record.  At trial, the State played the Allens' video-recorded conversation during McKay's testimony, but he did not testify to the truth of John's statements.

---

[3]        "Although the federal courts' interpretation of the Federal Rules of Evidence does not control our interpretation of our own evidentiary rules, federal precedent is particularly persuasive given that we have expressly sought to conform our rules to the federal rules."  *State v. Winegardner*, 243 Ariz. 482, 485 ¶ 8 (2018).

Aside from playing the recording, the State did not reference John's statements until closing argument:

> What does the Defendant know when Detective McKay is talking to her the second time. She knows John is there. She knows John is not sticking to the script of the hide and seek story that they came up with that day -- or the day of the murder. She knows other family members are there. She knows all of this. So, she starts back-pedaling. She starts trying to figure out how can I get around this. The detective knows I'm lying, so what should I do next.
>
> .  .  .  .
>
> John Allen immediately tells them, yep, I told the Detective that we had her doing the backbends, and that you had gone to bed. Right then and there, the Defendant -- it doesn't say, why the heck did you say that. Or -- that's what she says, why. Why did you say that. Because she knows it's a lie. She knows she wasn't sleeping. She knows that she just told Detective McKay that she was awake, and kind of told him to take her out of the box, and walked away. So right now the Defendant's like why are you doing this. Their stories are starting to not be consistent because John went -- he went off script, and she knows it.
>
> .  .  .  .
>
> After she talks to her husband, after she tells you -- not knowing it's recorded, not knowing that what she just said was heard by the Detective, she's back in with Detective McKay. At this point she learns from Detective McKay that the conversation was recorded. She learns that John has told them everything, and so what does she do. It's now every person for themselves. She's going to start throwing him under the bus, and she's now going to continue to try to minimize her role in the events, and in the murder.
>
> Look at the timing, and who she's talking to. **When she made that statement to John, I thought about it, unlocking it. John said the same -- essentially the same thing too.** It wasn't, oh my God, why are you saying this. You were asleep. **No, John's reaction, and John's statements to the Defendant is confirming that that is what happened**.

10

We ask you to use your common sense as Jurors. That's a common sense thing. When someone tells you something that's a bold face lie you call them out on it. You don't reaffirm it, and then throw yourself into it. So when she told John she thought about it, to go unlock it, and when she also made the statement that she was there when it happened, those are the timing -- look who she's talking to.

. . . .

And then she continues. If you look at the Defendant and John's statement. What are you going to do. I'm sorry, I want this to just be me. You promise. This is the Defendant again with John talking. So when she gets back in that room with McKay, she believes John is going to try to take the fall for this, not knowing about her statements being recorded.

(Emphasis added.) Each time the State referred to John's statements, it did so to highlight their effect on Sammantha and detail her reactions rather than to prove the truth of his statements. The only portion of the closing argument referencing John's statements that could be characterized as bolstering their truth (in bold) is permissible because those statements were admissible as opposing party's statements adopted by Sammantha—John merely acknowledged or said what Sammantha already believed to be true. *See* Ariz. R. Evid. 801(d)(2)(B). Thus, the trial court properly admitted John's statements.

¶31 Sammantha also argues that most of John's statements were irrelevant to the issues at trial. We disagree. Relevant evidence is that which "has any tendency to make a fact more or less probable than it would be without the evidence," if "the fact is of consequence in determining the action." Ariz. R. Evid. 401. Sammantha was charged with various acts of child abuse, some of which ultimately led to A.D.'s death. Thus, facts establishing Sammantha's role in A.D.'s death were plainly of consequence. During her conversation with John, Sammantha said she lied to McKay about knowing A.D. had been placed in the box on the night of her death and that a lock was used to prevent escape. John's statements place those events in context, highlight Sammantha's reactions, and reveal plans to cover up or minimize Sammantha's role in the death. The trial court did not err in admitting these statements.

¶32 Even assuming the court erred in admitting some of John's statements, any error was harmless in light of Sammantha's own properly admitted statements and other evidence establishing her guilt. *See State v. Dickens*, 187 Ariz. 1, 19 (1996) (concluding that erroneous admission of hearsay evidence that was cumulative to other evidence was harmless), *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239 (2012). Sammantha's admitted statements included acknowledgment that: (1) the box was locked on the night of A.D.'s death; (2) she considered unlocking the box but failed to do so; (3) it was dangerous to confine A.D. or any child in the box; and (4) A.D. had been placed in the box as punishment. Other evidence included Kassandrea's testimony that Sammantha and John previously placed A.D. in the box. And redacting the conversation further by removing less relevant portions such as off-hand remarks or crying would have only diminished the conversation's context rather than affected the verdict or sentence.

¶33 Finally, Sammantha claims John's statements, even if properly admitted, required a limiting instruction and the trial court's failure to give one constituted fundamental error. Sammantha concedes her failure to request such an instruction. Because the trial court was not required to give a limiting instruction absent Sammantha's request, there was no error. *See State v. Taylor*, 127 Ariz. 527, 530–31 (1980).

### 4. Admission of Detective McKay's Statements

¶34 Sammantha argues the trial court committed fundamental error by admitting McKay's final interrogation and failing to give a limiting instruction. Specifically, Sammantha claims McKay's statements and questions contained inadmissible hearsay in violation of the Confrontation Clause and impermissibly opined on the ultimate issue. By raising this issue for the first time on appeal, Sammantha forfeited it, *see supra* ¶ 15, but notwithstanding that, this evidence was properly admitted.

¶35 This Court previously recognized that the admission of "a videotaped interview in which a detective repeat[s] statements allegedly made by a non-testifying witness against the defendant" does not violate the Confrontation Clause when the statements are "used merely as a method of interrogation" and the jury understands they are not intended to prove "the truth of the matters asserted." *Boggs*, 218 Ariz. at 334 ¶ 33 (discussing *State v. Roque*, 213 Ariz. 193, 213–14 ¶¶ 69–70 (2006), *abrogated*

*on other grounds by State v. Escalante-Orozco*, 241 Ariz. 254 (2017)). In *Roque*, officers used the defendant's wife's incriminating statements to obtain a confession during a videotaped interrogation, but she never testified at trial. 213 Ariz. at 213 ¶ 69. We noted that "the detectives were using an interrogation technique to elicit a confession from [the defendant]" and concluded that "[t]he detectives' report of what [the wife] said was not being offered at trial for the truth of the matters allegedly asserted by [the wife] and therefore did not constitute hearsay." *Id.* at 214 ¶ 70. Thus, such statements are part of "a valid interrogation technique" and are admissible when not admitted for their truth. *See Boggs*, 218 Ariz. at 334 ¶ 33.

¶36        Here, as in *Roque*, McKay used statements made by non-testifying witnesses,[4] each implicating Sammantha in A.D.'s death, to elicit a response or confession during the videotaped interview. Because these statements were not offered to prove the truth of each witness' statement, they do not constitute testimonial hearsay and, thus, do not run afoul of the Confrontation Clause. Moreover, the State did not present evidence at trial to bolster the truthfulness of these statements, rely on the statements substantively, or attempt to admit the interrogations of the witnesses into evidence. Instead, McKay, like the detective in *Roque*, merely used the statements as an interrogation technique. The trial court did not err in admitting the videotaped interview.

¶37        Sammantha also claims that McKay impermissibly offered his opinion on the ultimate issue—i.e., Sammantha's guilt—during the interrogation. *Boggs* is instructive. In *Boggs*, the interrogating detective "repeatedly accused [the defendant] of lying." 218 Ariz. at 334 ¶ 37. At trial, "[t]he State played the . . . interrogation videos for the jury without redacting any portions in which [the detective] accused [the defendant] of lying." *Id.* The defendant, however, "did not object or request a limiting instruction." *Id.* On appeal, the defendant argued "the admission of the unredacted interrogations violated his right to a fair trial" because they contained prohibited "testimony concerning the veracity of a statement by another witness." *Id.* at 334 ¶ 37, 335 ¶ 39. We found no fundamental error "[b]ecause [the detective's] accusations were part of an interrogation technique and were not made for the purpose of giving opinion testimony at trial." *Id.* at 335 ¶ 40.

---

4        John, Judith, Cynthia, and the Bishop (a clergy member to whom Cynthia had spoken about the circumstances of A.D.'s death).

¶38　　　　Here, the trial court did not err by admitting McKay's videotaped interview of Sammantha. McKay's accusations during the interrogation were not offered as his opinion, but rather were permissibly admitted as an interrogation technique and an integral part of the videotaped interrogation. Moreover, as part of a lengthy interrogation, the accusation provided necessary context for Sammantha's statements and coherence for the jury's consideration. There was no error.

¶39　　　　Even if the statements were erroneously admitted, Sammantha fails to establish fundamental error or prejudice because the record is devoid of any instance in which the State used McKay's statements as substantive evidence.

### B. Striking of Juror 155

¶40　　　　Sammantha argues the trial court erroneously struck Juror 155.

¶41　　　　"Rulings on motions to strike prospective jurors are reviewed for an abuse of discretion." *State v. Ellison*, 213 Ariz. 116, 137 ¶ 88 (2006). A court abuses its discretion when its reasons for a ruling are "clearly untenable, legally incorrect, or amount to a denial of justice." *Riley*, 248 Ariz. at 167 ¶ 7 (quoting *State v. Chapple*, 135 Ariz. 281, 297 n.18 (1983)).

¶42　　　　During voir dire, the prosecutor asked the jurors if it would be difficult for them to impose the death penalty based on accomplice liability and posed a hypothetical in which a getaway driver faced the death penalty for a botched robbery resulting in death. After another juror said he could not sentence the driver to death, Juror 155 said, "I think the same thing." Juror 155 clarified that, "I would be looking for mitigating circumstances. And I think I would argue that since they didn't pull the trigger, I would kind of call that a mitigating circumstance. I would have trouble voting for it . . . . I think I would find that as a mitigating circumstance."

¶43　　　　Juror 155, a government teacher, had reviewed numerous death penalty cases with his students. In his questionnaire, he noted that he opposed the death penalty and would find it difficult to impose because

every case he reviewed had mitigating circumstances.  When asked if he could be fair and impartial, he responded:

> I don't know if fair is the word. I don't -- I would have trouble -- I don't think fair is the right word, but I would have trouble giving the death penalty. I mean, you would have to prove to me that there is not mitigating circumstances, and I just haven't seen an example of it.

Juror 155 also said he had donated to the Innocence Project and that his daughter interned there.

¶44        Defense counsel asked Juror 155 whether he could impose the death penalty in the absence of *any* mitigating circumstances.  Juror 155 replied, "I believe so.  Again, I go back to my statement of I just haven't seen it, but I think I could."  The State moved to strike Juror 155 for cause because he (1) had never seen a case where the death penalty was appropriate; (2) would not impose the death penalty unless there was a complete absence of mitigating factors; (3) repeatedly responded in his questionnaire that it would be difficult to impose the death penalty; and (4) could not say with certainty whether he had discussed the case with his class.  The defense objected, arguing that unease with the death penalty alone was not disqualifying, and that Juror 155 avowed he could impose the death penalty in the absence of any mitigating circumstances.

¶45        The trial court struck Juror 155 for cause.  It noted that he had repeatedly raised objections to the death penalty and, despite defense counsel's best efforts to rehabilitate him, he was always hesitant to say he could impose the death penalty.  The court was also troubled that he may have discussed the case with his students and, although that alone would not be a sufficient basis to strike him, it clarified the strike was based on "a multitude of factors."

¶46        The Fourteenth Amendment guarantees a defendant the right to a fair trial by a panel of impartial jurors. *See State v. Thompson*, 252 Ariz. 279, 294 ¶ 48 (2022).  A court may strike a juror for cause if his views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)), but not "simply because [he] voiced general objections to the death penalty or

expressed conscientious or religious scruples against its infliction," *id.* at 418 (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968)).

**¶47** Reviewing courts defer to the trial judge's perceptions of the juror and question only whether the judge's findings are supported by the record. *Id.* at 426, 434; *see also id.* at 425–26 ("Despite [a] lack of clarity in the printed record, . . . there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law."). Thus, a for-cause strike "may be upheld even in the absence of clear statements from the juror that he or she is impaired" because even extensive questioning may not be enough to make a juror's bias "unmistakably clear." *Uttecht v. Brown*, 551 U.S. 1, 7 (2007); *see also Wainwright*, 469 U.S. at 434 ("[W]hatever ambiguity respondent may find in this record, we think that the trial court, aided as it undoubtedly was by its assessment of [the juror's] demeanor, was entitled to resolve it in favor of the State.").

**¶48** This Court has reasoned that jurors who express strong reservations about the death penalty may be struck from the jury pool if the court believes those reservations would substantially impair the juror's performance. *See, e.g.*, *State v. Montano*, 204 Ariz. 413, 422–23 ¶¶ 38–39 (2003) (affirming strike of juror who said, among other things, "I just don't think I could do it" and "I would have a hard time for—because of religious grounds for me" about imposing the death penalty); *State v. Glassel*, 211 Ariz. 33, 49–50 ¶¶ 53–55 (2005) (to same effect).

**¶49** Here, Juror 155 expressed numerous reservations and overall hesitancy about imposing the death penalty during voir dire and in his questionnaire. While Juror 155 at one point stated he "believed" he could impose the death penalty if there were no mitigating circumstances, he responded "I don't know" when asked if he could be fair to the State. *See State v. Burns*, 237 Ariz. 1, 13 ¶ 23 (2015) ("A potential juror need not object to the death penalty in every possible case to warrant a dismissal for cause."). The trial court clarified it was striking Juror 155 based on his demeanor and hesitancy in answering the voir dire questions, and we must give meaningful deference to the court's observations. *See Wainwright*, 469 U.S. at 426. The court did not abuse its discretion in striking Juror 155 for cause.

## C. Denied Severance of Count 5

¶50      Sammantha argues that the trial court's denial of her pretrial motion to sever Count 5 from the remaining counts was error. We review a denial of severance for an abuse of discretion. *Burns*, 237 Ariz. at 13 ¶ 29. Because Sammantha failed to renew her motion during trial, we review only for fundamental error. *Goudeau*, 239 Ariz. at 443 ¶ 54; *see* Ariz. R. Crim. P. 13.4(c).

¶51      Count 5 alleged that Sammantha, while A.D. was in her care or custody on an occasion different from the one resulting in A.D.'s death, intentionally or knowingly caused or permitted A.D. to be placed in a situation where her person or health was endangered, to wit: placing A.D. in the box sometime in the six months preceding A.D.'s death. Sammantha argued that the State could not prove by clear and convincing evidence that the acts charged in Count 5 occurred because that count was based on Kassandrea's statements, and she could not specify the time or date that she had seen those acts. Sammantha also argued that even if the events were proven, Count 5 should be severed because (1) there was no proper purpose to admit evidence of the acts in Count 5; (2) the evidence was not relevant to any fact at issue; (3) the danger of unfair prejudice outweighed the probative value; and (4) a limiting instruction could not cure the risk of prejudice.

¶52      The State responded that all counts were connected in their commission and that the evidence was admissible for proper purposes, including proving motive, intent, and lack of mistake. For example, A.D. emerged from the box sweaty and distressed; thus, the prior act showed that Sammantha was aware of the danger. The trial court ordered an evidentiary hearing to determine whether to sever Count 5.

¶53      At the hearing, Kassandrea testified she saw Sammantha tell A.D. to get in the box and that A.D. complied before Sammantha locked it. Kassandrea said A.D. was punished that time for stealing food, and that A.D. emerged from the box crying, hot, sweaty, and red-faced. On cross examination, Kassandrea conceded that she could not recall the day, time, or month of the incident.

¶54      The court denied the motion, explaining that evidence pertaining to Count 5 would "be relevant to show [Sammantha's] intent to

lock the child in the box on or between July 11 and July 12, 2011, and that the acts committed on or before those dates were not a mistake or accident." The court also found that clear and convincing evidence supported Count 5, noting that Kassandrea's testimony was credible and that Sammantha had acknowledged placing A.D. in the box. Finally, the court found that the probative value of the evidence from Count 5 was not substantially outweighed by the danger of unfair prejudice.

¶55 A trial court has broad discretion to determine whether charges should be severed, and a defendant challenging a denial of severance must demonstrate prejudice. *State v. Prince* (*Prince I*), 204 Ariz. 156, 159 ¶ 13 (2003); *see also State v.* (*Robert W.*) *Murray*, 184 Ariz. 9, 25 (1995) ("A clear abuse of discretion is established only when a defendant shows that, at the time he made his motion to sever, he had proved that his defense would be prejudiced absent severance.").

### 1. Error

¶56 Generally, "in the interest of judicial economy, joint trials are the rule rather than the exception." (*Robert W.*) *Murray*, 184 Ariz. at 25. Under Arizona Rule of Criminal Procedure 13.3(a)(1), "two or more offenses may be joined in an indictment . . . if they . . . are of the same or similar character." *See also State v. Lee*, 147 Ariz. 11, 17 (App. 1985) (noting that "[t]he rules for joinder and severance must be read together"). Although a defendant has a right to sever an offense joined solely under Rule 13.3(a)(1), that right may not be exercised when "evidence of the other offense or offenses would be admissible under applicable rules of evidence if the offenses were tried separately." Ariz. R. Crim. P. 13.4(b).

¶57 To admit other act evidence, a trial court must first find "that there is clear and convincing proof both as to the commission of the other bad act and that the defendant committed the act." *State v. Anthony*, 218 Ariz. 439, 444 ¶ 33 (2008) (quoting *State v. Terrazas*, 189 Ariz. 580, 582 (1997)). Here, the trial court deemed Kassandrea's testimony credible and noted that Sammantha herself acknowledged placing A.D. in the box previously. As such, the trial court properly found there was clear and convincing evidence that Sammantha put A.D. in the box as a form of punishment. Therefore, this initial determination has been satisfied.

**¶58**        After concluding that a prior act is shown by clear and convincing evidence, the trial court must also "(1) find that the act is offered for a proper purpose under Rule 404(b); (2) find that the prior act is relevant to prove that purpose; (3) find that any probative value is not substantially outweighed by unfair prejudice; and (4) give upon request an appropriate limiting instruction." *Id.* Proper purposes include evidence admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ariz. R. Evid. 404(b).

**¶59**        Here, the trial court satisfied all four prongs. First, it found that evidence of Count 5 was relevant to prove Sammantha's intent and lack of mistake or accident—proper 404(b) purposes. Second, it found that the evidence was relevant to rebut Sammantha's claim that John was solely responsible for punishing A.D. Third, it ruled that the evidence regarding Count 5 was not substantially outweighed by the danger of unfair prejudice. Fourth, it provided proper limiting instructions by instructing the jury to consider each offense separately and advising the jury that the State had to prove each offense beyond a reasonable doubt. Thus, the trial court did not err in denying Sammantha's motion to sever because evidence from Count 5 would be admissible with the remaining counts. *See State v. (Ruben M.) Johnson*, 212 Ariz. 425, 429 ¶ 9 (2006).

## 2. Fundamental Error and Prejudice

**¶60**        Notwithstanding the cross-admissibility of evidence, Sammantha has also failed to carry her burden to demonstrate that fundamental, prejudicial error.

**¶61**        Sammantha argues there was fundamental error because the rub-off or spillover effects of the multiple counts "lessened the State's burden" on Counts 3 and 5. Whether severance should be granted based on the risk of rub-off depends on "whether the jury can 'keep separate the evidence . . . and render a fair and impartial verdict.'" *See State v. Van Winkle*, 186 Ariz. 336, 339 (1996) (quoting *State v. Lawson*, 144 Ariz. 547, 556 (1985)). Rub-off warrants severance only when the defendant "establishes a compelling danger of prejudice against which the trial court can not protect." *Id.* Furthermore, trial courts are given "considerable discretion" in determining whether severance is required. *Id.*

**¶62** Sammantha relies heavily on assumptions about what the jury *might* have considered in its deliberations. But this Court "presume[s] that jurors follow the court's instructions." *State v. Pandeli* (*Pandeli II*), 242 Ariz. 175, 189 ¶ 58 (2017). And there is no prejudice from a denial of severance when a "jury is instructed to consider each offense separately and advised that each must be proven beyond a reasonable doubt." *Prince I*, 204 Ariz. at 160 ¶ 17. Because the trial court properly instructed the jury on the requirement to consider each offense separately and the burden of proof for each offense, any risk of rub-off was mitigated by the court's instruction. Accordingly, Sammantha fails to establish fundamental error or prejudice.

## D. Corpus Delicti in Counts 1, 2, and 3

**¶63** Sammantha argues that Counts 1, 2, and 3 lacked corpus delicti. Because Sammantha did not raise the corpus delicti argument at trial, we review for fundamental error. *State v. Chappell*, 225 Ariz. 229, 234 ¶ 8 (2010).

**¶64** Corpus delicti requires the state to show that the victim's "injury was caused by criminal conduct rather than by suicide or accident" to avoid a conviction "based solely upon an uncorroborated confession or admission." *State v. Hall*, 204 Ariz. 442, 453 ¶ 43 (2003). The state's burden is to establish a reasonable inference of the corpus delicti; it need not provide proof beyond a reasonable doubt and may rely on circumstantial evidence. *Id.*

**¶65** Here, corpus delicti was established. C.J.'s testimony provided evidence that A.D. was being punished by the Allens the night before she died, and that she was told to lie and tell police the kids were playing hide-and-seek. The recorded interviews and Kassandrea's testimony provided evidence that Sammantha and John had confined A.D. in the box. Dr. Philip Keen conducted an autopsy of A.D.'s body and determined that she died of asphyxia while in the box. And McKay testified that the only key to the padlock used to lock A.D. in the box was found on John's key ring. Based on this evidence alone, the State met its burden of establishing a reasonable inference that A.D.'s death was caused by criminal conduct.

**¶66** The State asks this Court to strike the corpus delicti rule and notes that the rule has no constitutional or statutory founding. *See, e.g.,*

20

*Autry v. Estelle*, 706 F.2d 1394, 1407 (5th Cir. 1983) (noting that the corpus delicti doctrine "has no independent constitutional footing"). Trial courts may admit voluntary confessions, and there is no statutory requirement that a confession be supported by corroborating evidence. *See* A.R.S. § 13-3988(A). And a defendant's statements are also admissible as non-hearsay party admissions, Ariz. R. Evid. 801(d)(2)(A), with no reliability requirement, *State v. Garza*, 216 Ariz. 56, 66 ¶ 41 (2007). As such, the State argues that this authority should supplant the common law corpus delicti doctrine.

**¶67** Arizona adopts the common law unless it is "repugnant to or inconsistent with the Constitution of the United States or the constitution or laws of this state." A.R.S. § 1-201. And "if the common law is to be changed or abrogated by statute, the legislature must do so expressly or by necessary implication," and "[a]bsent a clear manifestation of legislative intent to abrogate the common law, we interpret statutes with 'every intendment in favor of consistency with the common law.'" *Pleak v. Entrada Prop. Owners' Ass'n*, 207 Ariz. 418, 422 ¶ 12 (2004) (quoting *In re Thelen's Estate*, 9 Ariz. App. 157, 160–61 (1969)).

**¶68** Corpus delicti is a common law doctrine. *State v. Gill*, 234 Ariz. 186, 188 ¶ 5 (App. 2014). This Court has recognized the rule for over 100 years, *see McCann v. State*, 20 Ariz. 489, 493 (1919), and the concept predates statehood, *Territory v. Monroe*, 2 Ariz. 1, 3 (1885) ("It would be folly to argue that a conviction for murder could be sustained when the corpus delicti is not proven."). Although there is no statutory requirement for corroborating evidence, there is nothing in § 13-3988 that evinces legislative intent to abrogate the corpus delicti rule. Nor does corpus delicti run afoul of the Arizona or federal constitutions. We decline to abridge the doctrine of corpus delicti.

### E. Rule 20 Motion on Counts 2 and 5

**¶69** Sammantha argues the trial court erred in denying her Rule 20 motion on Counts 2 and 5. We review a denial of a Rule 20 motion de novo, "viewing the evidence in a light most favorable to sustaining the verdict." *State v. Bible*, 175 Ariz. 549, 595 (1993).

**¶70** "After the close of evidence . . . the court must enter a judgment of acquittal on any offense charged in an indictment . . . if there

21

is no substantial evidence to support a conviction."   Ariz. R. Crim. P. 20(a)(1).  This Court has said that "[s]ubstantial evidence is more than a mere scintilla and is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt."  *Ellison*, 213 Ariz. at 134 ¶ 65 (quoting *State v. Mathers*, 165 Ariz. 64, 67 (1990)).  When deciding whether to grant a Rule 20 motion, "the trial judge must review the evidence in the 'light most favorable to the state, and all reasonable inferences are to be resolved against the defendant' to decide if a reasonable person could fairly conclude the defendant is guilty beyond a reasonable doubt."  *State v. Fischer*, 242 Ariz. 44, 49 ¶ 17 (2017) (quoting *State v. Clifton*, 134 Ariz. 345, 348 (App. 1982)).

### 1.   Count 2 (Conspiracy to Commit Child Abuse)

**¶71**        In Arizona, "[a] person commits conspiracy if, with the intent to promote or aid the commission of an offense," she "agrees with one or more persons that at least one of them or another person will engage in conduct constituting the offense," and one person "commits an overt act in furtherance of the offense."  A.R.S. § 13-1003(A).  A person commits child abuse when:

> Under circumstances likely to produce death or serious physical injury, [that] person . . . causes a child . . . to suffer physical injury or, having the care or custody of a child . . . causes or permits the person or health of the child . . . to be injured or . . . placed in a situation where the person or health of the child . . . is endangered . . . .

A.R.S. § 13-3623(A).

**¶72**        Criminal conspiracy requires proof of a common scheme or plan which may be inferred from circumstantial evidence.  *State v. Arredondo*, 155 Ariz. 314, 316–17 (1987).   "Any action sufficient to corroborate the existence of an agreement to commit the unlawful act and to show that it is being put into effect supports a conspiracy conviction." *Id.*; *e.g.*, *State v. Avila*, 147 Ariz. 330, 336 (1985) (finding evidence that "each participant knew what action he was to take" was sufficient).  And where reasonable minds may differ on the inferences drawn by the evidence, the trial court should not grant the defendant's Rule 20 motion.  *See State v. Landrigan*, 176 Ariz. 1, 4 (1993).

**¶73**        Here, there was sufficient evidence of an agreement between John and Sammantha.  C.J. testified to seeing the Allens punishing A.D. together in the hours preceding her death.  Sammantha told McKay that she was there when John ordered A.D. into the box.  When speaking with John alone, Sammantha suggested she worked with him to punish A.D., including stating "it was wrong of us to do everything that was done" and "[w]e should have stuck with your story."  Sammantha told McKay that she generally played a role in moderating John's punishments of A.D., and that John did not discipline A.D. when she was not there.  Based on this, a reasonable person could have found that Sammantha and John conspired to commit child abuse.  Thus, there was sufficient evidence for Count 2 to survive a Rule 20 motion.

### 2.  Count 5 (Child Abuse)

**¶74**        Count 5 alleged that Sammantha knowingly or intentionally committed child abuse in violation of § 13-3623(A) by locking A.D. in the box in the six months preceding her death.  To survive a Rule 20 motion, the State had to produce substantial evidence that Sammantha had care or custody of A.D. and that placing her in the box endangered or injured her.

**¶75**        Sammantha contends there were twenty-four other persons in the house; therefore, care or custody cannot be imputed to her.  The child abuse statute "does not require proof that the defendant is a parent or guardian of the minor child," *Cespedes v. Lee*, 243 Ariz. 46, 50 ¶ 19 (2017), rather care or custody "require[s] that the defendant accept responsibility for the child in some manner," *State v. (Barry L.) Jones*, 188 Ariz. 388, 394 (1997).  For example, substantial evidence revealed a defendant had care or custody of his girlfriend's child, who lived with him, because he acted as a caregiver to her and exercised control and responsibility over her when she was required to ask the defendant for permission to go outside or leave the house.  *Id.*

**¶76**        Here, there is substantial evidence that Sammantha had care or custody of A.D.  Sammantha admitted that she was involved in A.D.'s discipline, care, and education, and that she tried to teach A.D. the difference between right and wrong and how to do chores.  Thus, Sammantha had accepted responsibility for A.D.'s care.

¶77 Sammantha also argues there was no evidence that locking A.D. in the box on the prior occasion injured her or damaged her health, and she challenges the use of A.D.'s death in a later incident as evidence that previously placing A.D. in the box was harmful to her health.

¶78 The State needed to show only that Sammantha placed A.D. in a situation where her health was endangered. *See* § 13-3623(A). "Endanger" means to subject a child to potential harm that is more than the ordinary danger to which children are exposed daily. *State v. Mahaney*, 193 Ariz. 566, 568–69 ¶¶ 13–15, 569 ¶ 15 n.4 (App. 1999). Sammantha admitted to locking A.D. in the box and was aware that the situation was dangerous because she admitted telling Cynthia that placing A.D. in the box was not "a good idea" because a child could "suffocate" or "get cramps in their legs so when they stand up they're injured from falling." Further, A.D.'s death, while not conclusive, is evidence the jury may consider in determining whether placing A.D. in the box was injurious. *See State v. Martinson*, 241 Ariz. 93, 102 ¶ 41 (App. 2016) ("But the fact [the victim] died as a result of the child abuse is 'objective evidence' permitting the jury to conclude the abuse occurred under circumstances likely to produce death or serious physical injury."). There was ample evidence for this charge to be submitted to the jury.

### F. Alleged Duplicity of Counts 3, 4, and 5

¶79 Sammantha argues that the jury verdict was not unanimous because there are multiple ways to commit child abuse, and the verdict did not specify the method of conviction. This Court reviews questions of statutory interpretation de novo. *State v. (Rodney C.) Jones*, 246 Ariz. 452, 454 ¶ 5 (2019).

¶80 Sammantha was charged with three counts of child abuse. She contends that there are three separate, discrete methods of committing child abuse under § 13-3623(A). As such, the trial court should have required the jury to return verdicts specifying the theory of conviction. Section 13-3623 provides that child abuse may be committed in multiple ways including: (1) causing a child to suffer physical injury, (2) having care or custody of a child and causing or permitting the person or health of a child to be injured, and (3) having care or custody of a child and causing or permitting a child to be placed in a situation where the person or health of

the child is endangered. The statute also varies degrees of punishment based upon a defendant's mental state. § 13-3623(A)–(B).

**¶81** "A criminal defendant is entitled to a unanimous verdict. If an indictment is facially valid, but the state introduces evidence of several acts, each of which might satisfy the charge, the risk of a non-unanimous verdict is presented." *State v. Payne*, 233 Ariz. 484, 508 ¶ 81 (2013) (internal citation omitted). However, jurors may find a defendant guilty based upon a combination of alternative findings if only one charge is alleged. *Id.*; *State v. Herrera*, 176 Ariz. 9, 16 (1993) ("[T]he defendant is not entitled to a unanimous verdict on the precise manner in which the act was committed." (quoting *State v. Encinas*, 132 Ariz. 493, 496 (1982))).

**¶82** Section 13-3623 is an alternative means statute, which refers to an offense that may be committed in multiple ways. *State v. West*, 238 Ariz. 482, 489 ¶ 19 (App. 2015). Crimes described by alternative means statutes are also referred to as single unified offenses, wherein there is only one crime but the statute's language or structure provides different ways of committing the crime. *See id.*

**¶83** Juror unanimity as to the theory under which a defendant committed a crime is not required. *Id.* at 496 ¶ 46. As such, a jury may properly convict a defendant for first degree murder even if "six jurors found premeditation and six found felony murder." *State v. (Fabio E.) Gomez*, 211 Ariz. 494, 498 ¶ 16 n.3 (2005) ("A jury need not be unanimous as to the theory of first degree murder as long as all agree that the murder was committed.").

**¶84** This case is strikingly similar to *Payne*, where this Court rejected a challenge to an indictment containing three separate charges of child abuse. 233 Ariz. at 507–09 ¶¶ 80–90. Payne was charged with one count for breaking his daughter's bones, and two counts for endangering his son and daughter's health by failing to seek medical attention or allowing them to starve to death. *Id.* at 507 ¶ 80. We denied Payne's unanimous verdict challenge, noting that "as long as only one charge is alleged in a count of an indictment, jurors may 'reach a verdict based on a combination of alternative findings.'" *Id.* at 508 ¶ 81 (quoting *State v. Dann*, 220 Ariz. 351, 367 ¶ 79 (2009)).

¶85        Here, Sammantha was charged with three counts of child abuse under § 13-3623: Count 3 alleged Sammantha committed child abuse by locking A.D. in the box overnight; Count 4 alleged she committed child abuse by forcing A.D. to do backbends for hours; and Count 5 alleged that she committed child abuse by locking A.D. in the box in the six months preceding her death.  Like *Payne*, there is no potential for non-unanimous verdicts because each act had its own corresponding charge; thus, the indictment was not duplicitous.

### G.  Mens Rea of Counts 3 and 5

¶86        Sammantha argues that the State must prove that she intended to harm A.D. to sustain her guilty verdicts on Counts 3 and 5. "We review questions of statutory interpretation de novo." (*Rodney C.*) *Jones*, 246 Ariz. at 454 ¶ 5 (citation omitted).  Because Sammantha did not object at trial, we review for fundamental error. *See State v. Gendron*, 168 Ariz. 153, 154 (1991).

¶87        This Court interprets "statutes to give effect to the legislature's intent." *Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 383 ¶ 8 (2013).  When statutory "language is clear and unambiguous, and thus subject to only one reasonable meaning, we apply the language without using other means of statutory construction." *Id.*  However, if the language is ambiguous, we determine meaning by considering other factors, such as its "subject matter, and historical background; its effects and consequences; and its spirit and purpose." *Id.* (quoting *State v. (Melissa J.) Gomez*, 212 Ariz. 55, 57 ¶ 11 (2006)).

¶88        "Due process requires the State to prove every element of a charged crime beyond a reasonable doubt." *State v. (James C.) Johnson*, 247 Ariz. 166, 203 ¶ 149 (2019).  Statutorily required mental states apply "to each element of the offense unless it 'plainly appears' that the legislature intended otherwise." *Payne*, 233 Ariz. at 505 ¶ 70 (quoting A.R.S. § 13-202(A)).

¶89        As discussed, *supra* ¶ 80, child abuse requires the state to prove that the defendant caused a child to suffer serious physical injury or caused the health of the child to be injured or endangered.  § 13-3623.  The class of felony varies depending on the mens rea and whether the abuse occurred under circumstances likely to produce death or serious physical

injury. *See id.* There is no explicit requirement that the defendant have a specific intent to harm the victim.

**¶90** In *Payne*, this Court refused to extend § 13-3623's mens rea requirement to the portion of the statute requiring that acts occur under "circumstances likely to produce death or serious physical injury." 233 Ariz. at 506 ¶ 70. We noted that "[t]he structure of the statute . . . suggests that the mens rea refers to the act that the defendant 'does,' and not to the background circumstances," and declined to extend the mens rea to the circumstances clause. *Id.* ¶ 71; *cf. Mahaney*, 193 Ariz. at 568–69 ¶ 15 (noting that a defendant need only expose a child to potential harm to violate the statute). This reasoning governs here.

**¶91** The State needed to prove only that Sammantha injured A.D. or exposed her to potential harm to fulfill the requirements of § 13-3623. The statute's text does not require a defendant to do so knowingly or intentionally. Sammantha's claim fails.

### H. Sufficiency of Evidence for Count 3 and Alleged Insufficient Jury Instruction

**¶92** Sammantha argues that her conviction on Count 3 should be reversed because the prosecutor "asserted facts not in evidence," and there was insufficient evidence to support the jury's finding that she was a principal actor in the offense. Consequently, Sammantha claims that she was convicted on a theory of accomplice liability for which the jury was not instructed. Thus, the issue is whether sufficient evidence existed to convict Sammantha on Count 3 as a co-conspirator and, if not, whether the jury convicted her on an uninstructed accomplice liability theory.

**¶93** If counsel does not object to the submission of the case to the jury or move for a judgment of acquittal at trial, we review only for fundamental error. *State v. Stroud*, 209 Ariz. 410, 412 ¶ 6 n.2 (2005). "It is . . . fundamental error to convict a person for a crime when the evidence does not support a conviction." *Id.* (quoting *State v. Roberts*, 138 Ariz. 230, 232 (App. 1983)).

**¶94** Sammantha contends that the prosecutor improperly argued facts not in evidence during closing argument by asserting that Sammantha: (1) instructed A.D. to retrieve the box from outside; (2) had

John retrieve the padlock; (3) prevented A.D. from leaving the room while John retrieved the padlock; (4) ordered A.D. inside the box; and (5) locked A.D. inside the box. Consequently, Sammantha contends that the prosecutor invited the jury to convict her on a theory of accomplice liability absent such an instruction. Sammantha is incorrect on both arguments.

¶95 "Prosecutors are given 'wide latitude' in presenting closing argument to the jury." *Goudeau*, 239 Ariz. at 466 ¶ 196 (quoting *State v. Comer*, 165 Ariz. 413, 426 (1990)). They "may summarize the evidence, make submittals to the jury, urge the jury to draw reasonable inferences from the evidence, and suggest ultimate conclusions." *Id.* (quoting *Bible*, 175 Ariz. at 602).

¶96 The prosecutor's statements here were consistent with the evidence presented at trial. Indeed, Sammantha's own inculpatory statements belie her claim that the prosecutor argued facts not in the record. For example, the prosecutor's claim that Sammantha prevented A.D. from leaving the room is evidenced by Sammantha's interview with McKay:

> DM: Okay when [John] went to get the lock, you just stood there. How close were you guys to . . . the box you and [A.D.]?
>
> SA: I was by the doorway and she was over by the file cabinet.
>       .   .   .   .
> DM: Okay would that be the doorway for her to come in or go out of the room or what?
>
> SA: There's only one door.

Based on Sammantha's admission, the prosecution could argue—and a jury could reasonably believe—that Sammantha prevented A.D. from leaving the room.

¶97 There is also evidence establishing that: (1) Sammantha and John jointly forced A.D. to perform physical punishment for hours prior to locking her in the box; (2) immediately after they made A.D. engage in this physical punishment, A.D. was forced to drag the box in from outside; (3) after A.D. dragged in the box, John retrieved a padlock from outside while Sammantha waited with A.D. and blocked the only door to the room;

(4) after John retrieved the padlock, A.D. was ordered into the box; (5) after A.D. got in the box, John closed the lid and fastened it with the padlock, while Sammantha stood by; (6) after the box was padlocked, both Sammantha and John left together and laid down in their bed, leaving A.D. alone, contorted inside the locked box in an unventilated room, in the middle of summer in Phoenix; (7) despite claiming that she asked John to let A.D. out of the box, Sammantha never intervened or let A.D. out of the box; (8) Sammantha went to sleep while A.D. was still confined in the box; and (9) Sammantha admitted that her conduct constituted child abuse. Although the prosecutor "urge[d] the jury to draw reasonable inferences from the evidence," *id.*, she argued facts that were in evidence, and there was sufficient evidence to support a conviction on Count 3, *see State v. Fulminante*, 193 Ariz. 485, 494 ¶ 28 (1999) ("While each element of the offense must be established beyond a reasonable doubt, each supporting fact need not be.").

**¶98**        Moreover, Sammantha's assertion that the State improperly convicted her on a theory of accomplice liability, for which a jury instruction was not given, is unfounded because she was not convicted as an accomplice but as a principal and co-conspirator. The jury was properly instructed on the elements of child abuse and conspiracy to commit child abuse and that Sammantha's mere presence was insufficient to convict her; and it convicted her on these counts. During closing argument, the prosecutor argued that "[A.D.] died that night as a result of [Sammantha] and John working together to abuse her, and to put her in this box." And the State maintained this theory throughout the trial—e.g., it argued during the aggravation phase that Sammantha "was a major participant in the commission of child abuse that was charged in Count Three; and that [Sammantha] was recklessly indifferent regarding a person's life, [A.D.]'s life." Thus, the prosecution did not rely on a theory of accomplice liability.[5]

_____

[5]        Sammantha's claim that "the State acknowledged an accomplice liability instruction was required for child abuse and felony murder–but hadn't been given," is misleading. During a discussion with the trial court and defense counsel, one prosecutor did opine that an accomplice liability instruction was or should have been included as a part of the felony murder instruction, but the other prosecutor contemporaneously and correctly noted that an attempt instruction was given instead of an accomplice liability instruction because the State's theory was that Sammantha killed A.D.

¶99      "View[ing] the facts in the light most favorable to sustaining the jury verdict and resolving all inferences against [the defendant]," *Stroud*, 209 Ariz. at 412 ¶ 6, the record contains substantial evidence to support Sammantha's conviction on Count 3, as an equally culpable participant. No accomplice liability instruction was necessary.

## I.  Count 4's Alleged Duplicity and Sufficiency of Evidence

¶100     Sammantha alleges that Count 4 is legally infirm because (1) it was duplicitous, (2) its corresponding jury instructions were insufficient, and (3) the evidence was insufficient to sustain her conviction. Failure to object to an allegedly duplicitous indictment gives rise to fundamental error review, *Payne*, 233 Ariz. at 507–08 ¶ 80, as does counsel's failure to object to an allegedly insufficient jury instruction, *id.* at 516 ¶ 137.

¶101     Count 4 alleged that Sammantha committed child abuse by forcing A.D. to do backbends for hours. C.J. testified that she, A.D., and their brother had been rewarded with popsicles for finishing their chores. Later, C.J. found Sammantha and John in the classroom with A.D., where they were yelling at A.D. for something related to the popsicle. Later, C.J. saw A.D. doing wall stands in the living room with Sammantha and John, which was a standard form of punishment. After going to another room, C.J. returned to the living room around 7:30 p.m. to find A.D. doing backbends, which continued while everyone else was at dinner and was still occurring when C.J. went to bed around 9:00 p.m. C.J. testified that during this time, A.D. was crying, and that C.J. had never seen A.D. punished like that before.

¶102     Sammantha's statements differ from C.J.'s in a few ways: namely, Sammantha contends that she had A.D. in a backbend position for only an hour; that she had A.D. and the other children perform various physical activities with A.D.; that the activities also included jumping jacks and jogging around the yard; that A.D. was permitted to rest when she was tired; and that A.D. was also allowed to sit on the floor when she was tired.

### 1.  Duplicity

¶103     As discussed, *supra* ¶¶ 79–85, Sammantha was convicted for child abuse under § 13-3623, which outlines child abuse as a single unified offense. *See West*, 238 Ariz. at 489 ¶ 19. Regardless of the means used, the

statute creates a single crime of child abuse. *See id.* at 490 ¶ 21; *see also Payne*, 233 Ariz. at 508–09 ¶¶ 88–90 (reasoning that whether the child abuse was committed by failing to feed or provide medical care, it is "only one crime"). As such, Sammantha is not entitled to jury unanimity regarding "the precise manner in which the act was committed." *West*, 238 Ariz. at 492 ¶ 30 (quoting *Herrera*, 176 Ariz. at 16). Thus, Sammantha's argument rests on a flawed premise because the jury's unanimity was not required as to the means of Sammantha's child abuse.

¶104 Sammantha cites *State v. Klokic*, 219 Ariz. 241, 244 ¶ 12 (App. 2008), for the proposition that an indictment may be duplicitous when its text "refers only to one criminal act, but multiple alleged criminal acts are introduced to prove the charge." But the *Klokic* court acknowledged that "in drafting an indictment, the State may choose to charge as one count separate criminal acts that occurred during the course of a single criminal undertaking even if those acts might otherwise provide a basis for charging multiple criminal violations." *Id.* ¶ 14. Sammantha overlooks this exception. She similarly fails to address whether *Klokic*'s multiple-acts analysis is even applicable in alternative means cases. *See West*, 238 Ariz. at 494 ¶ 39 (explaining that in an alternative means case a defendant's "reliance on *Klokic*'s multiple-acts analysis is misplaced").

¶105 Even if the multiple-acts analysis applies, Sammantha is incorrect because the backbends, jumping jacks, and wall stands were all part of a continuous criminal act: child abuse. When, as here, separate abusive acts against a child are alleged without a reasonable basis for distinguishing them, and only one count of child abuse is alleged, the jury is "not required to unanimously agree on the manner of committing child abuse." *Payne*, 233 Ariz. at 508 ¶ 85; *see also West*, 238 Ariz. at 488 ¶ 13 (requiring the jury to unanimously find the defendant committed the charged child-abuse offense but not requiring unanimity on the manner of the abuse).

¶106 Here, the multiple acts alleged to support the child abuse charge involved the same risk of injury and endangerment and were part of a single criminal undertaking occurring over the course of one evening; thus, there was no reasonable basis to distinguish the acts. *West*, 238 Ariz. at 494–95 ¶ 40; *see also Klokic*, 219 Ariz. at 246 ¶ 25 ("[I]t is not reversible error for a trial court to fail to take curative action in circumstances in which there is no reasonable basis for distinguishing between the acts admitted

31

into evidence to establish a single charge."); *Payne*, 233 Ariz. at 508–09 ¶ 90 (concluding that child abuse is "only one crime" and the defendant "was not entitled to a unanimous verdict on the manner in which the act was performed"). Even under a multiple-acts analysis, Count 4 was not duplicitous.

**¶107** Sammantha has failed to demonstrate error, and our fundamental error analysis ends here. *See State v.* (*Easton C.*) *Murray*, 250 Ariz. 543, 548 ¶ 14 (2021). However, even if error did occur, Sammantha cannot demonstrate prejudice. *See State v. Paredes-Solano*, 223 Ariz. 284, 290 ¶ 17 (App. 2009) ("That an indictment is duplicitous does not, by itself, require reversal; a defendant must prove actual prejudice."). A defendant suffers no prejudice from a duplicitous charge where, as here, she presents the same defense to multiple acts. *Cf. Klokic*, 219 Ariz. at 249 ¶¶ 37–38 (discussing how separate defenses to multiple acts give rise to the possibility of a non-unanimous verdict); *State v. Schroeder*, 167 Ariz. 47, 53 (App. 1990) ("All of the acts were basically the same . . . . Defendant's only defense was that the acts did not occur. Thus, the jury was left with only one issue—who was the more credible of the only two witnesses . . . ? [T]he jury's verdict here implies that it did not believe the only defense offered."). Because Sammantha's defense to the various acts of child abuse did not differ among the acts, Sammantha also suffered no prejudice.

### 2. Jury Instruction

**¶108** Sammantha argues that Count 4's criminal negligence instruction was deficient because it failed to define "substantial and unjustifiable risk" of resultant injury. The trial court's criminal negligence instruction tracked the language of A.R.S. § 13-105(10)(d). Therefore, it did not constitute error. *See State v. Rios*, 217 Ariz. 249, 251 ¶ 9 (App. 2007) (finding no error occurred where trial court gave instructions that tracked express language of governing statutes).

### 3. Sufficiency of Evidence

**¶109** "In determining the sufficiency of the evidence, we view the evidence in the light most favorable to sustaining the verdict and resolve all reasonable inferences against the defendant." *State v. Lopez* (*Lopez I*), 163 Ariz. 108, 112 (1990). The appellate court's "task is to determine whether sufficient evidence existed so that a rational trier of fact could have

found guilt beyond a reasonable doubt." *Id.* And reversal "occurs only where there is a complete absence of probative facts to support the conviction." *State v. Soto-Fong*, 187 Ariz. 186, 200 (1996) (quoting *State v. Scott*, 113 Ariz. 423, 424–25 (1976)). Although a record may contain conflicting evidence, the jury is tasked with "weigh[ing] the evidence and determin[ing] the credibility of the witnesses." *State v. Williams*, 209 Ariz. 228, 231 ¶ 6 (App. 2004).

**¶110** Sammantha's admissions about her punishments of A.D. using various calisthenics and C.J.'s testimony about A.D.'s physical suffering provided sufficient evidence for a reasonable jury to find that Sammantha was criminally negligent.

### J. Sufficiency of Evidence for Count 1

**¶111** Sammantha argues that the evidence was insufficient to support conviction for felony murder (Count 1). Although Sammantha rehashes her arguments concerning the sufficiency of the evidence for the underlying felony, we need not do the same. *See supra* ¶¶ 92–99. In addition, Sammantha alleges errors with the State's use of evidence and instruction on the elements of felony murder.

**¶112** First, Sammantha asserts that the State "invite[d] the jury to convict [her] for felony murder based in part on acts comprising Count 4." Contrary to Sammantha's claim, the Count 4 evidence—showing that Sammantha and John forced A.D. to engage in physical punishment for several hours prior to placing her in the box—was *also* direct and circumstantial evidence that John and Sammantha were working together, as equally culpable participants, when they subsequently locked A.D. in the box as alleged in Count 3. Thus, this evidence was relevant to, but not dispositive of, her convictions on Counts 1 and 3.

**¶113** Next, Sammantha contends the State failed to prove causation for the felony murder charge, and that the jury was not instructed on that element. Specifically, Sammantha argues that "to satisfy felony murder's 'independent element of causation, . . . the evidence had to show that [hyperthermia], malnutrition, dehydration and/or bruising and abrasions caused [A.D.'s] death.'"

¶114 Felony murder's independent causation element required the State to prove only that "'in the course of and in furtherance of' an enumerated felony, including child abuse, that defendant *'causes the death* of any person.'" *State v. Bennett*, 213 Ariz. 562, 567 ¶ 23 (2006) (quoting A.R.S. § 13-1105(A)(2)). Section 13-203(A) provides that "[c]onduct is the cause of a result" if (1) "[b]ut for the conduct the result in question would not have occurred" and (2) "[t]he relationship between the conduct and result satisfies any additional causal requirements imposed by the statute defining the offense." And "death is in furtherance of an underlying felony if the death resulted from an action taken to facilitate accomplishment of the felony." *Burns*, 237 Ariz. at 21 ¶ 77 (quoting (*Barry L.*) *Jones*, 188 Ariz. at 397). Thus, proving felony murder required the State to establish that Sammantha committed child abuse and that the abuse caused A.D.'s death. *See Bennett*, 213 Ariz. at 568 ¶ 28. The State was not required to show that every result of the abuse—hyperthermia, malnutrition, dehydration, bruising, and abrasions—was also the cause of A.D.'s death.

¶115 Here, the evidence established that Sammantha—acting with John—intentionally and knowingly committed child abuse by allowing A.D. to be forced into the box, blocking the only exit to the room while John obtained the lock, leaving A.D. alone inside the box in a hot room, and then failing to release her after she and John went to bed. Sammantha does not dispute that A.D.'s overnight confinement caused her death. Moreover, Sammantha's concealment of the crime and untruthfulness established consciousness of guilt. *See, e.g.*, *State v. Weible*, 142 Ariz. 113, 116 (1984) ("[C]oncealment after a crime . . . bears on the issue of the defendant's consciousness of guilt."); *Fulminante*, 193 Ariz. at 494 ¶ 27 (explaining that the "[d]efendant made several false, misleading, and inconsistent statements to police, other witnesses, and his wife—showing consciousness of guilt"). Therefore, the evidence was sufficient to prove that Sammantha (1) intentionally or knowingly caused A.D. to suffer physical injury, or permitted her to be injured or placed in a situation where her health would be endangered while she was in her care or custody, *see* § 13-3623(A), and (2) caused A.D.'s death in the course of and in furtherance of abusing her, *see* § 13-1105(A)(2).

¶116 Finally, Sammantha claims that the jury was not properly instructed on felony murder's causation element. But the instructions properly mirrored the statutory language of § 13-1105(A)(2), *see Rios*, 217 Ariz. at 251 ¶ 9, and Sammantha's reliance on *State v. Schad,* 142 Ariz. 619

(1984) is misplaced. In *Schad*, the trial court erroneously allowed the jury to convict the defendant of felony murder without providing a jury instruction for the elements of the predicate felonies. *Id.* at 620–21. Here, the jury received proper instruction on the predicate felony of child abuse and on the elements of felony murder. Moreover, as already addressed, *supra* ¶¶ 98–99, Sammantha's claim that the jury should have been instructed on accomplice liability fails.

### K. Absence of Jury Instruction on the Lesser-Included Offenses to Count 1

**¶117** Sammantha alleges that the trial court violated the Eighth Amendment by failing to instruct the jury on a lesser-included offense of felony murder. Because Sammantha did not request this instruction, we review only for fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 19 (2005).

**¶118** Count 1 charged felony murder predicated on child abuse as alleged in Count 3. Sammantha argues that, because the felony murder count was predicated on the child abuse alleged in Count 3, the "lesser-included offense" of child abuse was "wholly subsumed" within the felony murder charge; thus, she argues, the jury should have been instructed on child abuse in the felony murder jury instruction itself.[6]

**¶119** Contrary to Sammantha's claim, "[i]t is well established that no lesser included offense to felony murder exists because the *mens rea* necessary to satisfy the premeditation element of first degree murder is supplied by the specific intent required for the felony." *LaGrand*, 153 Ariz. at 30; *see also* (*Robert W.*) *Murray*, 184 Ariz. at 34 ("[T]here are no lesser included offenses of felony murder. . . ."); *State v. Krone*, 182 Ariz. 319, 323 n.6 (1995) ("In a pure felony murder case, no lesser included instruction is necessary because felony murder includes no lesser offense."). Accordingly, "[w]here no lesser included offense exists, it is not error to

---

[6] Allen's insistence that *Beck v. Alabama*, 447 U.S. 625 (1980), commands a different result has already been addressed. *See State v. LaGrand*, 153 Ariz. 21, 30 (1987) ("[W]e have already explained at length why *Beck* is inapposite to Arizona law.").

refuse the instruction." *LaGrand*, 153 Ariz. at 30. There was no error in failing to instruct the jury on a non-existent, lesser-included offense.

## L. Absence of Jury Instruction on the Lesser-Included Offenses to Count 5

¶120 Initially, Sammantha contended that the trial court failed to instruct the jury on the lesser-included offenses of Count 5, but later conceded that she invited the error.

¶121 During a discussion on jury instructions, defense counsel requested that—in regard to Count 5—the jury be instructed pursuant to § 13-3623(A)–(B), both under circumstances (1) likely to produce serious injury or death and (2) other than those likely to produce death or serious physical injury. However, counsel asserted that an instruction on the lesser forms of child abuse, including reckless and negligent, was unnecessary:

> MR. CURRY: With respect to Count Five, by my right, if it happened it was intentional or knowing. But she's entitled to a lesser-included offense instruction on circumstances other than those likely to produce death or serious physical injury.
>
> THE COURT: Okay. So with respect to Count Five, you're not asking that the jury be advised of lessers of reckless or negligent, but you want them to have the option of finding intentional or knowing under circumstances other than those.
>
> MR. CURRY: Correct.

The court instructed the jury accordingly, and the jury convicted Sammantha of intentional or knowing child abuse under circumstances likely to cause death or serious physical injury.

¶122 Sammantha affirmatively invited the alleged error and, thus, is precluded from raising it on appeal. *See State v. Logan*, 200 Ariz. 564, 566 ¶ 11 (2001) ("The purpose of the [invited error] doctrine is to prevent a party from 'injecting error in the record and then profiting from it on appeal.'" (quoting *State v. Tassler*, 159 Ariz. 183, 185 (App. 1988))); *State v. Musgrove*, 223 Ariz. 164, 167 ¶¶ 8–9 (App. 2009) (finding the doctrine applied where the defendant "informed the trial court that he did not want a lesser

included offense instruction, implicitly agreeing with the state that the evidence did not support such an instruction").

## M. Admission of Photographs

**¶123** Sammantha alleges that the trial court erred in admitting certain irrelevant and inflammatory photographs. Because Sammantha did not object to admission of the photos during trial, we review this issue for fundamental error only. *See Henderson*, 210 Ariz. at 567 ¶ 19.

**¶124** Sammantha moved in limine to preclude certain "gruesome" photographs as lacking probative value "because they [would] not be used to prove or disprove an issue that [was] disputed," as "the cause and manner of death [were] not contested." The State contended that the photographs were admissible to illustrate the abuse, death, and autopsy of A.D., and to show the scene of the crime and aid the jury in determining whether a murder happened.

**¶125** The court instructed the defense to object at trial if there was a gruesome photograph it wished to exclude from evidence. At trial, when the State moved to admit all of the photographs, the court asked the defense if it objected, the defense answered that it did not, and all photographs were admitted. On appeal, Sammantha challenges admission of the photographs of A.D.'s body, the box with its measurements, and A.D.'s body with its measurements.

**¶126** "Trial courts have broad discretion in admitting photographs." *Burns*, 237 Ariz. at 19 ¶ 60. A three-part test determines whether photographs of a murder victim are admissible: "whether the photograph is relevant, whether it has 'the tendency to incite passion or inflame the jury,' and its probative value versus its potential to create unfair prejudice." *Id.* ¶ 61 (quoting (*Robert W.*) *Murray*, 184 Ariz. at 28). The photographs here satisfy this standard.

**¶127** The photographs of A.D.'s body are relevant because "[a] photograph of the deceased in any murder case is relevant to assist a jury in understanding an issue because the fact and cause of death are always relevant in a murder prosecution." *Id.* ¶ 62. Photographs of a victim's body may be introduced for several reasons, including:

to prove the corpus delicti, to identify the victim, to show the nature and location of the fatal injury, to help determine the degree or atrociousness of the crime, to corroborate state witnesses, to illustrate or explain testimony, and to corroborate the state's theory of how and why the homicide was committed.

*Chapple*, 135 Ariz. at 288. Indeed, we have said that "[i]f any of these questions is contested, either expressly or implicitly, then the trial court may find that the photographs have more than mere technical relevance," and the trial court may admit them "notwithstanding a tendency to create prejudice" because they have bearing on a contested issue. *Id.* Thus, "[a]s long as the photograph has some probative value it is admissible even if inflammatory." *State v. Clark*, 126 Ariz. 428, 433 (1980).

¶128 Relying on *State v. Bocharski*, 200 Ariz. 50 (2001), Sammantha claims that the photographs were "wholly irrelevant" because the cause of death, and the fact that A.D. died while in the box, were uncontested; thus, she alleges that the photographs were introduced merely to inflame the passions of the jury. In *Bocharski*, we reiterated that if the consequence of a fact is uncontested by the defendant "then a relevant exhibit's probative value may be minimal. Under such circumstances, gruesome photographs may 'have little use or purpose except to inflame,' and their prejudicial effect can be significant." *Id.* at 56 ¶ 23 (quoting *Chapple*, 135 Ariz. at 288). There, we found that the trial court had improperly admitted photographs of the victim's skull—with its top and contents removed and a metal rod going through an opening to the inside—because "they had little tendency to establish any disputed issue in the case" and the prosecution did not elicit testimony about the angles of the wounds, which was the purported basis for admitting the images. *Id.* at 55 ¶ 20, 56 ¶¶ 25–27.

¶129 Here, the State introduced the photos to illustrate and corroborate A.D.'s abuse, her death and autopsy, and the scene of the crime—making them, unlike the photos in *Bocharski*, relevant to prove the central contested issues in the case: that A.D. was abused, the injuries were not the result of an accident, and that Sammantha's actions led to A.D.'s death. Moreover, Dr. Keen utilized many of the photographs during his expert testimony, further bolstering their relevance. *See State v. (Danny L.) Jones*, 185 Ariz. 471, 485 (1996) ("These photographs were relevant to illustrate the medical examiner's testimony, to show the cause of [the

victims'] deaths and the similarities of their injuries, and to refute defendant's claim that another person killed [one of the victims].");  *State v. Eastlack*, 180 Ariz. 243, 257 (1994) (to same effect).  Thus, the State relied upon the photographs here to corroborate testimony, unlike in *Bocharski* where the court admitted the photos to show the angles of the wounds but "the prosecutor did not elicit testimony concerning these angles or their significance."  200 Ariz. at 56 ¶ 26.

**¶130**     Because the photographs were admitted to prove contested issues and corroborate expert testimony, they had probative value and were admissible despite any incidental inflammatory effect.  *See Burns*, 237 Ariz. at 19 ¶ 62 ("Although the photographs are gruesome, and thus had some potential to inflame the jury, their probative value outweighs any danger of unfair prejudice.").

### N. *Enmund/Tison* Finding

**¶131**     Sammantha argues the jury's *Enmund/Tison* finding was erroneous because the jury was misled by the State, and the evidence was insufficient to support either basis for this finding.  We review Sammantha's claims that insufficient evidence supported the jury's findings during the aggravation phase for substantial evidence, viewing the evidence in the light most favorable to sustaining the jury verdict.  *Allen*, 248 Ariz. at 358 ¶ 11.

#### 1.  *Enmund/Tison*

**¶132**     The Eighth Amendment protects against punishments that are greatly disproportional to the offense charged.  *Id.* at 358 ¶ 8.  During the aggravation phase of a felony murder trial—before the death penalty can be imposed—the jury must make an *Enmund/Tison* finding.  *Id.* ¶ 9. Such a finding requires that one or both of two tests be satisfied.  *Id.*  Under *Enmund*, the jury must find that the defendant killed, attempted to kill, or intended a killing take place.  *Id.* (citing *Enmund v. Florida*, 458 U.S. 782, 797 (1982)).  Alternatively, under *Tison*, the jury must find that the defendant (1) was "a major participant in the underlying felony" and (2) acted "with reckless indifference to human life."  *Id.* (citing *Tison v. Arizona*, 481 U.S.

39

137, 158 (1987)).[7] Here, the court instructed the jurors that it would impose a life sentence unless they found either that Sammantha killed A.D. *or* was a major participant in the child abuse against A.D. and was recklessly indifferent to her life. The court explained that "[e]ach of you must find that at least one factor has been proven, but you all need not find that it is the same factor." As in *Allen*, the verdict form asked jurors to indicate their individual votes on each factor. The jury was divided in its *Enmund/Tison* finding, with eight jurors finding Sammantha "killed" and four jurors finding she "was a 'major participant' in the commission of child abuse *and* was 'recklessly indifferent' regarding a person's life."

¶133 In John's case, he contested the sufficiency of the evidence underlying the *Enmund/Tison* finding, but whether the jury was required to unanimously make that finding under a single theory was not before us. *See id.* at 358–59 ¶¶ 11–12. Perhaps as a consequence, we might have overstated the scope of an appropriate *Enmund/Tison* finding by noting that if jurors were divided on how *Enmund/Tison* was satisfied, "substantial evidence must exist for both findings." *Id.* ¶ 11. No Arizona case has decided this issue. We now explicitly address whether a jury must be unanimous in deciding how the *Enmund/Tison* finding is satisfied to qualify a defendant for the death penalty.

¶134 We have stated that "jurors may . . . reach a verdict based on a combination of alternative findings." *Dann*, 220 Ariz. at 367 ¶ 79. For example, the jury need not be unanimous as to whether a first degree murder was premeditated or felony murder. *See* (*Fabio E.*) *Gomez*, 211 Ariz. at 498 ¶ 16 n.3 ("As to the first degree murder conviction, six jurors found premeditation and six found felony murder."). The issue here is whether the *Enmund/Tison* finding could similarly be satisfied by alternate findings.

_____

7 As a preliminary matter, Sammantha contends *Enmund/Tison* was inapplicable because the standard "doesn't apply unless one is convicted as an accomplice" and the jury was not instructed on accomplice liability. However, it is well-established that the *Enmund/Tison* inquiry applies in felony murder cases where there is more than one participant in the underlying felony. *See, e.g.*, *Allen*, 248 Ariz. at 358 ¶¶ 8–9; *Forde*, 233 Ariz. at 567–68 ¶¶ 97–98; *State v. Bearup*, 221 Ariz. 163, 170–72 ¶¶ 32–43 (2009). At the aggravation phase when the jury instruction was given, Sammantha had already been convicted of felony murder, so the *Enmund/Tison* inquiry applied.

¶135          In *Tison*, the Supreme Court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." 481 U.S. at 158. Thus, *Enmund* established the initial culpability requirement—that the defendant killed, attempted to kill, or intended to kill the victim—in 1982, and in 1987 *Tison* created a lesser standard that satisfies *Enmund*'s culpability requirement. *See People v. Banks*, 351 P.3d 330, 338 (Cal. 2015) ("The defendants' actions in [*Tison*] and [*Enmund*] represent points on a continuum. Somewhere between them, at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for death eligibility." (internal citations omitted)); *id.* at 343 (referring to *Tison*'s required mental state, reckless indifference to human to life, as a "lesser standard" than *Enmund*'s intent requirement). As such, proof of juror unanimity as to which standard individual jurors found satisfied is not required. *See Dann*, 220 Ariz. at 366 ¶ 75 (holding "no violation of Arizona law or denial of due process resulted when the court did not submit a separate *Enmund/Tison* verdict form to the jury" because the jury was properly instructed on the law and is presumed to have followed the instructions); *Perez v. State*, 919 So. 2d 347, 367 (Fla. 2005). Thus, a better articulation of the standard on review when a jury was divided on its *Enmund/Tison* finding is that substantial evidence must exist such that it satisfies either the *Enmund* or the *Tison* standard. The trial court here correctly instructed the jury in this regard; it had no need to ask jurors to specify how they decided the requirement was met. Trial courts should remove this unnecessary language from verdict forms in future cases.

### 2. *Enmund*

¶136          Sammantha argues that the *Enmund* jury instruction was constitutionally defective because the jury was not instructed that "killed" means *personally* killed. Relying on this interpretation, Sammantha claims the jury's finding that she killed A.D. was insufficient as a matter of law and factually unsupported.

¶137          In *Enmund*, the Supreme Court concluded that the Eighth Amendment does not permit the death penalty to be imposed on someone who "aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." 458 U.S. at 797.

There, the defendant was a getaway driver waiting outside during the robbery where the killings took place. *Id.* at 788. Under those circumstances, the Court reasoned imposing the death penalty would violate the Eighth and Fourteenth Amendments. *Id.*

¶138        This Court has interpreted *Enmund*'s "killed" requirement to be satisfied if the defendant actually kills the victim—i.e., death results from his or her actions—regardless of the defendant's intent. *See Allen*, 248 Ariz. at 359 ¶ 12. Presence throughout, along with intentional participation in the killing, also supports this finding. *See State v. Gillies*, 135 Ariz. 500, 515 (1983). In John's case, this Court found substantial evidence supported the *Enmund* finding because "[h]e told [A.D.] to get inside a plastic box that was twenty-one inches shorter than her, shut the lid, placed a lock on it to prevent her escape, kept the only key, and left her there unsupervised while he went to bed." *Allen*, 248 Ariz. at 359 ¶ 12. Because A.D. ultimately suffocated as a result of those actions, sufficient evidence supported the jury's finding that John actually killed A.D. *Id.*

¶139        Here, although John and Sammantha's acts were different, the substantial evidence lens requires only enough evidence that a reasonable person could accept as sufficient to prove the defendant's guilt. The facts of this case are unlike a more straightforward felony murder scenario involving an identifiable killer—e.g., a triggerman—and a killing resulting directly from his or her actions. A.D. was "killed" when she suffocated. John may have locked the box, but Sammantha was one of two adults in the room who participated in the punishment of placing her in it. The evidence also supports that Sammantha blocked A.D.'s only escape from the room while John retrieved the lock. Both John and Sammantha went to bed, leaving A.D. in the box where she suffocated. It was reasonable for the jury to conclude that Sammantha killed A.D.

3. *Tison*

¶140        Sammantha contends that her "passive conduct" was legally insufficient to meet *Tison*'s "major participant" requirement. In *Tison*, the Court refused "to precisely delineate the particular types of conduct . . . warranting imposition of the death penalty." 481 U.S. at 158. The underlying felony in *Tison* was kidnapping, and the defendants' participation included assisting the killers in their escape from prison, flagging down the victims' car, and standing by idly as the murders

occurred. *Id.* at 151–52. To distinguish *Enmund* factually, the *Tison* Court stated that "[f]ar from merely sitting in a car away from the actual scene," the current defendants were actively involved and "present during the entire sequence of criminal activity culminating in the murder." *Id.* at 158.

¶141 In Arizona, the major participant requirement has been satisfied by planning and active participation in the felony. *See, e.g., Forde*, 233 Ariz. at 567 ¶ 98 (planning and executing burglary and robbery resulting in murders was sufficient). In *Bearup*, the defendant was a major participant where he held a knife to prevent the victim from leaving during a kidnapping, even though he did not participate in the baseball bat beating that ultimately killed the victim. 221 Ariz. at 170–71 ¶¶ 34–35. The distinction between participation in the "killing" and participation in the underlying felony is key in evaluating this prong. It is Sammantha's major participation in the underlying felony—i.e., the child abuse as charged in Count 3—that satisfies this prong.

¶142 Here, as in *Tison*, it is not disputed that Sammantha was present throughout the sequence of child abuse that led to A.D.'s death, and that she admitted to standing by the door in the classroom with A.D. while John went to get the padlock from outside. The jury heard Sammantha and John's candid conversation where he implied that he lied to police to minimize her involvement. In that same recording, Sammantha says, "I think the only thing they're going to nail me with is child abuse." When John was questioning how police discovered they were punishing A.D. in the box, Sammantha said "[i]t's not a lie."

¶143 The evidence shows that, like the defendant in *Bearup*, Sammantha's presence during the abuse was intended to prevent A.D. from leaving the room. She stayed with A.D. while John went to get the padlock, and although she may not have been wielding a knife like the defendant in *Bearup*, she was an adult presence preventing A.D. from leaving the room to avoid her final punishment. We can only speculate about A.D.'s fate had Sammantha not been present, but it was not unreasonable for the jury to find that she was a major participant in locking A.D. in the box overnight. Hence, the jury convicted Sammantha on the predicate child abuse (Count 3) and on conspiracy to commit the abuse alleged in Count 3 (Count 2). Sammantha's argument that her role in the child abuse was too "passive" to make her a major participant is unavailing, especially when viewed in the light most favorable to sustaining the jury's finding.

**¶144**        The second prong of the *Tison* test requires that the defendant acted with reckless indifference to human life. "[K]nowingly engag[ing] in criminal activities known to carry a grave risk of death" supports a finding of reckless indifference. *State v. Lacy*, 187 Ariz. 340, 351 (1996) (quoting *Tison*, 481 U.S. at 157). In *Forde*, we found that entering a home at night with armed men who were known to be motivated to kill, even if the defendant herself intended only to rob the victims, demonstrated such knowledge. 233 Ariz. at 568 ¶¶ 99–101; *see also Ellison*, 213 Ariz. at 135 ¶ 73 (finding reckless indifference when defendant participated in burglary). In *Bearup*, this threshold was satisfied where the facts suggested that the defendant later became aware that the victim's life was in danger due to either his actions or the actions of his friends who were engaging in the victim's beating even if he was initially unaware of the risks. 221 Ariz. at 172 ¶¶ 41–43.

**¶145**        Sammantha cites *Lacy* to support her argument that her actions were insufficient to satisfy *Tison*'s reckless indifference prong. In *Lacy*, this Court clarified that mere presence at the time of the murder and failure to render aid is not enough to impose the death penalty. 187 Ariz. at 351. There, the evidence established that, at most, the defendant "stole a microwave after one of the murders and did nothing to prevent either victim's death." *Id.* at 352. We also noted that a reckless indifference finding is problematic when "there are multiple suspects, no eyewitnesses, and minimal physical evidence." *Id.*

**¶146**        Here, the record supports the jury's conclusion that Sammantha acted with reckless indifference to human life. Although her undisputed presence and failure to render aid are insufficient standing alone, the evidence supports the conclusion that she knew she was engaging in activities that carried a grave risk of death to A.D. It is undisputed that Sammantha went to bed knowing that A.D. was still in the locked, hot box. The jury heard Sammantha say to John in their candid conversation, "I didn't even wake up to go unlock it and I thought about it." Sammantha told McKay she did not allow her own children to play in the box for fear of injury. The size of the box and heat in the room alone support the ineluctable inference that A.D.'s confinement created a risk to her life. The fact that Sammantha expressed regret for not releasing A.D. from the box also demonstrates her subjective knowledge of the danger. Moreover, although we conclude that there is substantial evidence to

support the jury's "reckless indifference to human life" finding, we note the jury's guilty verdict on Count 3's child abuse charge required it to find that Sammantha intentionally or knowingly committed the offense "[u]nder circumstances likely to produce death or serious physical injury," § 13-3623(A), which would more than satisfy the "reckless indifference to human life" finding. On this record, it is only logical that the eight jurors who found that Sammantha actually *killed* A.D. also would have found that she at least recklessly disregarded A.D.'s life.

¶147 Given the unusual facts of this case, it is worth noting that, unlike *Lacy*, this was not simply a failure to render aid to a dying victim; Sammantha actively participated in A.D.'s punishment and her failure to release A.D. from the box before she suffocated was what killed her. To characterize Sammantha's actions as mere presence or a simple failure to render aid in a life-threatening situation mischaracterizes the facts. *Lacy* does not support Sammantha's claim.

¶148 Finally, Sammantha claims the State impermissibly referenced Count 4, which was not the underlying felony, and implied that Sammantha was vicariously liable for John's conduct. Sammantha cites to the prosecutor's closing argument during the aggravation phase as improper and misleading but does not point to any particular statement. Contrary to her assertion, the State explained that Count 3 was the underlying felony of the murder, and directed the jury to Sammantha's actions in making this finding—e.g., the prosecutor said "[t]he second factor you may consider is the degree to which the Defendant participated in the felony" and "[s]o, it is the Defendant, not John Allen who is directing [A.D.'s] abuse . . . ." Because the jury was properly instructed and no improper reference occurred, there was no error.

¶149 We deny relief because there was substantial evidence to satisfy both the *Enmund* and *Tison* standards for culpability.

## O. Aggravating Circumstances

¶150 Sammantha challenges the jury's aggravating circumstances findings for the felony murder charge (Count 1) as insufficient or erroneous on several grounds. First, the "especially cruel, heinous or depraved" aggravating factor finding lacked the necessary accomplice liability instruction, the evidence was insufficient, and it should not have applied

because A.D.'s death was unintended. Second, the "prior serious offense" aggravating factor finding was insufficient as a matter of law. Third, the court erred in denying her request for an evidentiary hearing on the constitutionality of the capital sentencing scheme—i.e., the aggravating factors. We review the adequacy of the jury's aggravating circumstances findings for "an abuse of discretion and will uphold it if substantial supporting evidence exists." *Allen*, 248 Ariz. at 361 ¶ 22.

¶151        Before establishing a defendant's eligibility for the death penalty, the trier of fact must find one or more aggravating circumstances. A.R.S. § 13-751(E). During the aggravation phase, the jury instructions listed the following aggravating circumstances as alleged by the State:

1. The defendant was previously convicted of a serious offense, either preparatory or completed.

2. The defendant committed the offense in an especially cruel, heinous or depraved manner.

3. The Defendant was an adult at the time the offense was committed and the murdered person was under fifteen years of age.

*See* § 13-751(F). The jury unanimously found that all three factors were proven beyond a reasonable doubt.

### 1. Aggravating Factor (F)(6): "Heinous, Cruel or Depraved"

¶152        Sammantha first argues that the jury was improperly instructed because it did not have an accomplice liability instruction when it considered this factor. "We review the trial court's decision to refuse a requested instruction for an abuse of discretion." *Payne*, 233 Ariz. at 515 ¶ 136. At trial, Sammantha requested that the jury be given the standard "Capital Case 1.0.1—Accomplice Liability" jury instruction. The State responds that its theory was not that she was an accomplice but instead was "an active, equally culpable co-conspirator." The requested jury instruction states:

In the phase where you found the defendant guilty of first-degree murder, you were instructed that a defendant can be

46

criminally responsible for actions of the defendant's accomplices. Those instructions regarding accomplices apply only to that phase; they do not apply in the current phase of the trial, or in any later phase that might occur.

In the current phase of the trial, the actions of other individuals are not attributed, or imputed, to the defendant. Your determination of whether or not the State has proved an aggravating circumstance must be based on the defendant's own actions and own mental state. This determination must be based only on what the defendant did, what the defendant intended, what the defendant knew would happen, or what the defendant was reasonably certain would happen.

Rev. Ariz. Jury Inst. (Crim.) Capital Case 1.0.1, at 592 (5th ed. 2019).

¶153 The "Use Note" to this instruction says it should be given only where "evidence shows that there was an accomplice involved." *Id.* Because the jury was not instructed on accomplice liability during the guilt phase, the first paragraph of this instruction was inapplicable and may have been confusing. Given that the State's theory was not that Sammantha was John's accomplice, this jury instruction as a whole was unnecessary because it serves to refocus the jury on the defendant's conduct and mental state—something that would only be necessary if it had considered accomplice liability during the guilt phase. Thus, the omission of this instruction was not error.

a. *Cruelty*

¶154 "A murder is especially cruel if the jury finds 'the victim consciously suffered physical or mental pain and that the defendant knew or should have known that the victim would suffer.'" *Allen*, 248 Ariz. at 359–60 ¶ 17 (quoting *State v. Sanders*, 245 Ariz. 113, 126 ¶ 43 (2018)). The first part of the cruelty inquiry focuses on the "physical and mental suffering of the victim during the murder." *State v. (Doris) Carlson*, 202 Ariz. 570, 581 ¶ 41 (2002). Sammantha contends that the State did not meet its burden because it presented no evidence A.D. consciously suffered physical or emotional pain. The State responds that the record is replete with evidence describing the nature of the punishment and A.D.'s injuries as she

47

presumably struggled to free herself from the box where she ultimately asphyxiated.

¶155        Because this factor focuses on the victim's experience, this Court's explanation in John's case as to why substantial evidence supported a finding of especial cruelty subsumes Sammantha's arguments in their entirety.  *See Allen*, 248 Ariz. at 361–62 ¶¶ 23–30.  With no obvious exception, the substantial evidence discussed in John's case was also presented to the jury in this case.  The jury here could have reasonably found that "A.D. suffered physical pain by being stuffed inside a hot, cramped box in an uncomfortable position that restricted her movements and breathing after already suffering muscle fatigue from her prior punishments."  *Id.* at 361 ¶ 26.  Although a finding of physical pain alone would be sufficient, the jury could also have reasonably found A.D. suffered mental anguish when she "tried to ease her breathing by escaping the box . . . and panicked when she could not do so."  *Id.* at 361 ¶ 27.  Thus, substantial evidence supported this finding.

¶156        Sammantha also argues the instructions were deficient in permitting the jury to consider an objective standard for this factor's mental state requirement—i.e., the finding could either be that Sammantha knew or *should have known* that A.D. would suffer.  As the State correctly notes, this Court has approved the objective language used in the jury instructions in this case.  *Sanders*, 245 Ariz. at 126 ¶ 43; *see also* (*Doris*) *Carlson*, 202 Ariz. at 582 ¶ 44 ("Foreseeability in connection with the cruelty factor has been based on an objective rather than subjective standard.").  Thus, giving an objective standard to the jury was not error.

¶157        However, even using an objective standard, Sammantha argues that the mental state required for this finding could not be satisfied because A.D.'s death was an "unintended consequence" of the underlying felony.  She cites (*Doris*) *Carlson* to support this argument and further contends that the "should have known" standard violates the Eighth Amendment.  However, Sammantha quotes (*Doris*) *Carlson* out of context and ignores that it was an accomplice liability case.  There, in assessing the mental state requirement for this factor, we stated that "[i]n capital cases *involving accomplices*, a better test than mere foreseeability of suffering is a finding that the defendant intended that the murder be committed in such a manner as to cause the victim to suffer or, absent intent, knew it would be so." (*Doris*) *Carlson*, 202 Ariz. at 583 ¶ 47 (emphasis added).  The facts of

that case prompted our assessment of the required mental state because the defendant there "was not present during [the] commission of the crime, did not supply the murder weapon, and was not involved in planning the details or method of murder," but rather was charged as an accomplice. *Id.* In John's case, we rejected an argument very similar to Sammantha's argument here:

> [John] contends that like the *Carlson* defendant, he was an accomplice to the murder and, therefore, the trial court erred by not instructing the jury it could only find especial cruelty if he subjectively intended that A.D. suffer or was reasonably certain that would occur. We disagree. As we observed in [*Payne*, 233 Ariz. at 516 ¶ 143], *Carlson* analyzed the mental state of an accomplice who did not witness the murder. Here, as with the defendant in *Payne*, [John] directly participated in the murder. [John] locked A.D. in the box himself and ensured she remained inside by padlocking the box shut, keeping the only key, and leaving A.D. unsupervised while he went to bed. This case does not involve acts unwitnessed by an accomplice, and therefore *Carlson* is inapposite.

*Allen*, 248 Ariz. at 360 ¶ 21. Similarly, in *Payne*, we rejected an argument that a negligent state of mind is insufficient to satisfy this factor. 233 Ariz. at 516–17 ¶¶ 142–44. There, the defendant locked his own children in a closet and allowed them to starve to death. *Id.* at 516 ¶ 144. We found that even though the deaths may not have been intentional, the foreseeable suffering of the victims satisfied the required mental state. *See id.* at 516–17 ¶ 144. Notably, the defendant there also relied on *Carlson*, and we also found that it was "inapposite" because it "was analyzing the mental state for the unobserved acts of an accomplice." *Id.* at 516 ¶ 143.

¶**158** Thus, the standard is whether Sammantha knew *or* should have known A.D. would suffer. Like the defendant in *Payne,* even if Sammantha did not in fact know, she should have known that locking a child in a box much smaller than her in a hot room would cause suffering. It was not only foreseeable from a commonsense perspective, but suffering was *the reason* for the punishment. Because the State did not have to prove that Sammantha subjectively knew or intended A.D. would suffer, we deny relief.

b. *Heinous or Depraved*

**¶159**      A murder is especially heinous or depraved when—focusing on the defendant's state of mind—the factfinder determines it was senseless, the victim was helpless, and the defendant maintained a caregiver relationship with the victim. *See Allen*, 248 Ariz. at 363 ¶ 36. Sammantha argues that the caregiver prong of this test was not met, and that the jury instructions unconstitutionally expanded *State v. Gretzler*, 135 Ariz. 42 (1983),[8] by allowing the jury to conclude that a cousin relationship was sufficient. Sammantha once again relies on *Carlson* to support her assertion that this factor should not be expanded to other family members. There, we cautioned against expanding the *Gretzler* factors, reasoning that "[c]ontinual case-by-case expansion of these factors would lead to serious constitutional problems in view of the constitutional mandate to avoid arbitrary imposition of the death penalty." (*Doris*) *Carlson*, 202 Ariz. at 585 ¶ 55. Thus, we concluded that the familial relationship of an adult woman who hired someone to kill her mother-in-law who did not live with her was insufficient. *Id.* at 574–75 ¶¶ 2–8, 584–85 ¶¶ 55–56.

**¶160**      Contrary to Sammantha's assertion, however, whether a caregiver relationship exists does not hinge on the degree of familial relationship; instead, we look to the trust the child had in the caregiver. *Allen*, 248 Ariz. at 364 ¶¶ 39–40; *see also State v. Styers*, 177 Ariz. 104, 115–16 (1993) (finding depravity when babysitter killed the child he cared for). In John's case, the following evidence supported this finding: John and A.D. lived in the same house; he took part in decisions regarding her welfare; he disciplined her; and, importantly, A.D. had stopped trying to avoid punishment in the box because she knew John or Sammantha would eventually let her out. *Allen*, 248 Ariz. at 364 ¶ 40. The evidence at trial

---

[8]      "The heinous and depraved portion of the (F)(6) aggravator focuses on the defendant's state of mind at the time of the crime. However, the inquiry concentrates on the defendant's mental state as evidenced through her actions. The factors used to establish a heinous and depraved state of mind are (1) relishing the killing, (2) commission of gratuitous violence, (3) mutilation of the victim, (4) senselessness of the killing, and (5) helplessness of the victim." (*Doris*) *Carlson*, 202 Ariz. at 583–84 ¶ 51 (internal citations omitted) (describing the five "*Gretzler* factors"). This list, however, is not exhaustive. *Riley*, 248 Ariz. at 183 ¶ 101.

showed that Sammantha lived in the same house with A.D. as part of an extended family, Sammantha admitted that she assisted with A.D.'s homeschooling and punishments, and that she tried to teach A.D. right from wrong. Thus, like in John's case, the jury's finding that Sammantha had a caregiver relationship with A.D. was supported by substantial evidence.

## 2. Aggravating Factor (F)(2): Prior Serious Offense

**¶161** A prior "serious offense" for purposes of this aggravator includes "[a]ny dangerous crime against children." § 13-751(F)(2), (J)(6). A dangerous crime against children includes "[c]hild abuse as prescribed in § 13-3623, subsection A, paragraph 1." A.R.S. § 13-705(R)(1)(h) (2021). That section defines the abuse to include knowingly or intentionally causing injury to a child. *See* § 13-3623(A)(1).

**¶162** Sammantha argues that the State did not prove, and the jury did not find, that she was at least eighteen years old when she committed the prior offenses charged in Counts 3 and 5. The State points to Sammantha's first interview with McKay where she said her birthday was June 14, 1988, making her twenty-three years old at the time of the offense. Despite Sammantha being *in fact* over eighteen when she committed both Counts 3 and 5 (only one was needed to find this factor) and she does not dispute this, she claims error occurred because an "essential [dangerous crime against children] element is the defendant 'was at least eighteen years of age.'" Sammantha does not cite any authority to support her assertion that the jury was required to make a "factual finding" that she was eighteen to support this factor. Indeed, the Supreme Court has stated that the "fact of a prior conviction" does not need to be submitted to a jury. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

**¶163** In any event, her age was in the record and the jury *did* make a finding—during the aggravation phase—beyond a reasonable doubt that Sammantha was eighteen at the time the Count 3 events occurred. On the first day of the mitigation phase, the trial court specifically said that the jury "found that the defendant was at least 18 years of age at the time the offense was committed," and defense counsel stated in his opening that Sammantha "was born in 1988." Thus, this argument is meritless and any conceivable error harmless.

**¶164** Second, Sammantha argues that double jeopardy applied to her Count 3 conviction under the test articulated in *Blockburger v. United States*, 284 U.S. 299 (1932), so this aggravating factor cannot be used. Sammantha is correct that the predicate felony and felony murder are treated as the "same offense" for double jeopardy purposes. *Lemke v. Rayes*, 213 Ariz. 232, 239 ¶ 18 (App. 2006). However, double jeopardy protections apply "only if there has been some event, such as an acquittal, which terminates the original jeopardy." *Id.* ¶ 19 (quoting *Richardson v. United States*, 468 U.S. 317, 325 (1984)). Thus, double jeopardy *would* bar later prosecution of the predicate felony after a conviction for felony murder based on it, *see Harris v. Oklahoma*, 433 U.S. 682, 682 (1977), but that is not the case here. Sammantha was convicted of child abuse as charged in Count 3 during the same prosecution as her conviction for felony murder. It is well-settled that felony murder and the predicate felony can be punished separately during a single trial. *E.g.*, *State v. (Michael J.) Carlson*, 237 Ariz. 381, 401 ¶ 84 (2015); *State v. (Shawnte S.) Jones*, 235 Ariz. 501, 503–04 ¶ 13 (2014).

**¶165** Further, although the jury was instructed it could find this aggravator based on either Count 3 or 5, there was no error because "[w]e have previously rejected the argument that double jeopardy prohibits the use of predicate felonies as 'capital sentencing aggravators.'" *Sanders*, 245 Ariz. at 125 ¶ 40 (quoting *Goudeau*, 239 Ariz. at 470 ¶ 219); *see also Burns*, 237 Ariz. at 22–23 ¶¶ 86–88 (confirming "that an element of a crime may also be used as a capital aggravator"); *State v. Cruz*, 218 Ariz. 149, 169 ¶ 130 (2008) (same); *Goudeau*, 239 Ariz. at 470 ¶ 219 (to same effect). Thus, no violation of double jeopardy occurred.

### 3. Denial of Evidentiary Hearing

**¶166** Sammantha argued to the trial court that Arizona's capital sentencing statute is unconstitutional because its aggravating factors render virtually every first degree murder death penalty eligible. Without addressing the merits of this argument, she contends the trial court abused its discretion in denying her an evidentiary hearing on the issue before imposing a death sentence. But, as the State notes, we rejected essentially the same argument in (*James C.*) *Johnson*, and we need not revisit it here. *See* 247 Ariz. at 179–80 ¶¶ 7–11.

### P. Jury Instruction on Sammantha's Failed Plea Agreement

¶167        Sammantha argues that instructing the jury during the penalty phase regarding her willingness to plead guilty and the Maricopa County Attorney's ("the County Attorney") refusal to resolve her case through plea agreement constituted fundamental, prejudicial error warranting resentencing. A party's failure to object to an allegedly errant jury instruction waives the issue on appeal to all but fundamental error. *State v. Valenzuela*, 194 Ariz. 404, 405 ¶ 2 (1999).

¶168        In this case, the State did not offer a plea agreement to Sammantha, though she sought one. During the trial's penalty phase, defense counsel sought to present an offer letter from Sammantha explaining that she would agree to plead guilty to all charged offenses if the State dropped the death penalty. The court allowed the defense to read the non-redacted portions of the letter to the jury:

> We're writing to ask that your office extend a plea offer to Sammantha Allen in the hope that we can settle this case instead of going to trial. Our proposal is that Sammantha plead guilty to first degree murder, that the State will withdraw its notice of intent to seek the death penalty, and that we stipulate to a sentence of life in prison.

The court also permitted the defense to read a portion of a court transcript from the pretrial settlement conference where Sammantha confirmed she would be willing to plead guilty to murder for a natural life sentence.

¶169        Immediately after the letter was read to the jury, the prosecutor—noting that the jurors "now looked confused" as to why they were at trial—requested that the trial court instruct the jury that the State is under no obligation to offer a plea bargain. The court agreed and instructed the jury as follows:

> Pursuant to Arizona law, the State is under no obligation to make any defendant a plea offer or to accept a defendant's offer to plead guilty. The county attorney of Maricopa County makes the final decision whether to accept an offer to plead guilty to first degree murder and be sentenced to natural life.

The defense objected to the timing of the instruction but not its content. This was also repeated in the final written instructions.

**¶170** Acceptance of responsibility can be a mitigating circumstance. *See* A.R.S. §§ 13-751(G), -752(G); *Busso-Estopellan v. Mroz*, 238 Ariz. 553, 554–55 ¶ 7 (2015) (concluding that the defendant was entitled to present, as mitigating evidence, his willingness to plead guilty because it reflected his acceptance of responsibility). If the jury is confused by the introduction of a defendant's plea offer or the state's response to it, "[t]he trial court may avert such confusion, for example, by instructing the jury that the State was not required to extend a plea offer." *Busso-Estopellan*, 238 Ariz. at 555 ¶ 10. The trial court's instruction here was permissible.

**¶171** However, Sammantha contests the second sentence of the instruction, referencing the County Attorney's authority to accept a guilty plea offer on first degree murder in exchange for a natural life sentence. She offers two discernable arguments: (1) the reference to the County Attorney served as "impermissibl[e] vouch[ing] for the government's stance that a life sentence was unwarranted," and (2) the judge violated the constitution by commenting upon trial evidence, specifically by "advis[ing] the jury of the County Attorney's extra-judicial stance concerning Sammantha's offer to plead." These arguments are unavailing.

**¶172** First, no vouching occurred here. Relying on *United States v. Young*, 470 U.S. 1 (1985), Sammantha claims that the State used the instruction to express its opinion about the credibility of witnesses or to give its personal opinion on the defendant's guilt. Unlike *Young*, however, neither the County Attorney, nor the prosecutor who requested the instruction, expressed a personal opinion here. *See id.* at 18 (explaining that the prosecutor was impermissibly "vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused"). The jury instruction here was a correct statement of fact: the defendant has no right to a plea agreement because the County Attorney, as the county's prosecutor, has the discretion to accept or extend such agreements. *See State v. Draper*, 162 Ariz. 433, 440 (1989) ("A criminal defendant does not have a right to a plea agreement."); *see also State v. Morse*, 127 Ariz. 25, 31–32 (1980) ("Far from being available upon a defendant's demand, a plea bargain can be obtained only by agreement among the defendant, his counsel and the prosecuting attorney, subject to the approval of the trial court."). Contrary to Sammantha's assertion, the proffered jury instruction did not "vouch"

for the County Attorney's *personal* opinion of Sammantha's guilt (or offer any opinion at all). Of course, the State believed Sammantha was guilty and deserving of the death penalty; if not, it would not have charged Sammantha and sought a death sentence during the penalty phase. That fact, however, does not constitute a *personal* opinion about the case, the evidence, or Sammantha's proffered plea agreement.

¶173 Second, the court did not inappropriately comment on the evidence in violation of the Arizona Constitution. *See* Ariz. Const. art. VI, § 27 ("Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law."). Here, the court merely instructed the jury on the law. Sammantha misconstrues the facts and provides no authority to support the proposition that a trial court's provision of a jury instruction on the State's authority to accept or extend plea offers somehow constitutes a comment on the evidence. Moreover, Sammantha's assertion that the court "advised the jury of the County Attorney's extra-judicial stance concerning [her] offer to plead" is baseless because (1) the County Attorney did not take a stance on her offer to plead; (2) the jury instructions did not mention a stance on her offer to plead, rather they described the County Attorney's authority; and (3) the court did not advise the jury of such a nonexistent stance. Therefore, the trial court did not err in giving this jury instruction.

### Q. Preclusion of Mitigating Factor

¶174 Sammantha argues that the trial court erroneously precluded her from presenting a non-statutory mitigating factor to the jury. Specifically, she sought to admit statements made by Jeanine Sorrentino, the prosecutor at Cynthia and Judith's sentencing.[9] In a capital case, we review the admission of evidence during the penalty phase, if objected to, for an abuse of discretion. *Burns*, 237 Ariz. at 28 ¶ 127.

¶175 Sammantha asserts that during the penalty phase of her trial, the court erred in excluding evidence of a non-statutory mitigating factor—namely, that the box punishment was a learned behavior. To support this

---

[9] Cynthia and Judith were also indicted and ultimately convicted for abusing A.D.

notion, Sammantha sought to introduce Sorrentino's statements at Cynthia and Judith's sentencing, including that: "[t]he people who ran the home were two. . . . [Judith and Cynthia are] the matriarchs of this family. What they say goes. . . ." After describing the box punishment, Sorrentino also posited that:

> [Q]uite honestly, John and [Sammantha] *may* never have [put A.D. in the box] if they hadn't spent weeks, months or possibly even years learning from Judith and Cynthia that this was okay behavior, because these things don't happen in a vacuum. And if somebody in authority steps up and says no, this isn't okay, and if you do it you're out and if you do it I will call the proper authorities, then the behavior stops.

(Emphasis added.)

¶176        During the penalty phase of her trial, Sammantha attempted to admit these statements. Initially, defense counsel attempted to discuss Sorrentino's statements during opening statement. The State objected and, after sidebar, the court sustained the objection because Sorrentino was not being called as a witness and admitting the statements would constitute "vouching."

¶177        After a subsequent hearing on a motion to reconsider, the court again denied Sammantha's request to admit the statements for at least two reasons. First, it was cumulative because the jury had already heard evidence that Judith, Cynthia, and other adults used confinement to punish A.D., and that Judith and Cynthia raised Sammantha and were the matriarchs of an abusive household. Second, the court was concerned that if Sorrentino's statements were admitted, even though the jury had repeatedly been instructed that prosecutors' arguments were not evidence, the jury might confuse those statements as evidence and fail to draw its own conclusions concerning whether Judith and Cynthia influenced Sammantha's actions.

¶178        In *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), the Supreme Court discussed the importance of individualized considerations in capital cases, given the gravity of the sentence, and concluded:

> [T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

Thus, it struck down Ohio's death penalty statute, which limited the factfinder's consideration to only three enumerated mitigating factors. *Id.* at 608.

¶179 The *Lockett* standard was later clarified in *Eddings v. Oklahoma*, 455 U.S. 104, 113–14 (1982), which held that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." In other words, the sentencer may determine the weight to be given to "relevant mitigating evidence," but the court cannot exclude it from consideration. *Id.* at 115. Relevant evidence can include, among other things, anything related to family history, neglect, abuse, and emotional disturbances. *See id.* at 115–16. After *Lockett* and *Eddings*, we have held that the only limitation on the admissibility of mitigating evidence is relevance. *State v. Lopez* (*Lopez II*), 175 Ariz. 407, 415 (1993). Although the rules of evidence do not limit admissibility during the penalty phase of a capital trial, the relevance inquiry is still guided by Arizona Rule of Evidence 403 considerations, including the need to avoid confusing the issues, misleading the jury, or needlessly presenting cumulative evidence. *See McDaniel v. Payson Healthcare Mgmt., Inc.*, No. CV-20-0333-PR, 2022 WL 2555944, at *5 (Ariz. July 8, 2022) (noting Rule 403 permits a trial court to exclude cumulative evidence).

¶180 Sammantha correctly asserts that evidence of her upbringing and learned behaviors was relevant and admissible during the penalty phase. *See* § 13-752(G) ("At the penalty phase, the defendant . . . may present *any* evidence that is relevant to the determination of whether there is mitigation that is sufficiently substantial to call for leniency." (emphasis added)). But the question is whether Sorrentino's statements were admissible.

¶181 Sammantha argues Sorrentino's statements were factual and, thus, were admissible evidence or even "judicial admissions." But the

federal cases Sammantha cites are inapposite. *See ACLU of Nev. v. Masto*, 670 F.3d 1046, 1064–65 (9th Cir. 2012) (discussing how a representation made to a court was a judicial admission because the state "went beyond a simple expression of its legal position" and represented its position "as a matter of law"); *United States v. Wilmer*, 799 F.2d 495, 502 (9th Cir. 1986) (concession by defense counsel that elements of intoxication were met was a judicial admission). A judicial admission is:

> An express waiver made in court or preparatory to trial by the party or his attorney conceding for the purposes of the trial the truth of some alleged *fact*, has the effect of a confessory pleading, in that the *fact* is thereafter to be taken for granted; so that the one party need offer no evidence to prove it and the other is not allowed to disprove it. . . . It is, in truth, a substitute for evidence, in that it does away with the need for evidence.

*Fulminante*, 193 Ariz. at 492 ¶ 17 (quoting 9 Wigmore, Evidence § 2588, at 281 (Chadbourn rev. 1981)).

¶182        Here, as discussed in the next section, Sorrentino's assertions were largely undisputed during Sammantha's penalty phase. To the extent they were not, they were merely Sorrentino's speculative opinions as to the possible effects of learned behaviors on Sammantha—e.g., "John and [Sammantha] *may* never have [put A.D. in the box] if they hadn't spent weeks, months or possibly even years learning from Judith and Cynthia that this was okay behavior." (Emphasis added.) Thus, the statements were neither judicial admissions nor factual assertions, and the trial court's concern that Sorrentino's statements may confuse the jury was reasonable.

¶183        Even if Sorrentino's speculative comments would not have confused the jury, the State argues that "any conceivable error was harmless" because her comments were cumulative of admitted evidence. During the penalty phase, Cynthia testified that she started punishing A.D. with confinement in the box, did so on multiple occasions, and that Judith and others knew about it. The jury also heard testimony about Sammantha's controlling childhood with Cynthia and Judith. In its penalty phase closing, the defense repeated Sorrentino's words without attribution to her by stating that "Judith and Cynthia, they were the matriarchs of this family of this house, . . . what they say — goes," and "quite honestly,

58

[Sammantha] may never have done this if she hadn't spent weeks, months, or years learning from these matriarchs that this behavior was okay. Because these things do not happen in a vacuum." Thus, the court did not abuse its discretion in precluding Sorrentino's statements, which were not evidence, because they would have been cumulative of information embodied in admitted evidence.

¶184        Sammantha also argues that precluding Sorrentino's statements permitted the State to take inconsistent positions regarding who was in charge, who initiated the punishment, and Sammantha's personal culpability. In *United States v. Salerno*, 937 F.2d 797, 810–11 (2d Cir. 1991), *rev'd on other grounds*, 505 U.S. 317, the Second Circuit found that a prosecutor's statements in a related trial should have been admitted in a subsequent trial as admissions by a party opponent. The court held that the prior opening statement should have been admissible because the government had characterized the defendant first as a victim and later as an orchestrater, and "the jury was entitled to know that." *Id.* at 812; *see also United States v. McKeon*, 738 F.2d 26, 32–33 (2d Cir. 1984) (discussing the federal standard for the "evidentiary use of prior jury argument").

¶185        Sammantha argues that on four occasions the State asserted positions inconsistent with Sorrentino's statements. First, Sammantha asserts that the State took a position in her penalty phase during Cynthia's cross-examination inconsistent with Sorrentino's statements because it minimized Cynthia's role. The court queried the State and concluded that, in context, Cynthia's cross-examination did not elicit information inconsistent with Sorrentino's statements:

> The State has never been inconsistent with regard to who killed [A.D.]. They are not disputing that the older adults, including the defendant's grandmother, mother, and uncle, confined [A.D.] to a box and engaged in other acts of child abuse prior to [A.D.]'s death and while the defendant was living in the residence. They are not disputing that Sammantha Allen was raised by Judith Deal and Cynthia Stoltzmann. There is evidence before the jury where the jury could find that Judith Deal and Cynthia Stoltzmann were the matriarchs of the family, that they were in charge of the house.

The record supports the trial court's conclusion.

¶186     Second, Sammantha contends that the State asserted an inconsistent position during its penalty phase closing argument when it posed the following to the jury:

> And ask yourselves this. How do you know that it was Cynthia Stoltzmann who was the first person to use the box as discipline? She said she was. The defendant said she was. But does that make it true? Did Cynthia say that in an attempt to protect her daughter, just like she's been protecting her since the morning of July 20th when she knew the hide-and-seek story was bogus? It's for you to decide.

The State also asked during closing, "[s]o was it Cynthia coming up with these punishments? Or was it the defendant?," and "the defendant was very involved in the discipline of [A.D.], so was the defendant modeling her mother's behavior? Or was her mother modeling the defendant's behavior?" Sammantha's argument appears to be that the prosecutor's invitation to the jury to conclude that Sammantha conceived of the box punishment is inconsistent with Sorrentino's earlier speculation that Sammantha "*may* never have [put A.D. in the box] if they hadn't spent weeks, months or possibly even years learning from Judith and Cynthia that this was okay behavior." (Emphasis added.) But the prosecutor's *invitation* to the jury in Sammantha's case to draw its own conclusion about the origin of the box punishment is not inconsistent with Sorrentino's earlier *speculation* on acceptable behavior in the household generally.

¶187     Third, also in the penalty phase closing, the State said: "Now, you need to ask, why is the defense trying so hard to paint this horrible picture of Judith Deal?," and "[t]here is no evidence from anyone that Judith Deal ever subjected her children to the type of abuse the defendant inflicted on [A.D.]." Sammantha alleges that this is inconsistent because Judith was "convicted by plea and imprisoned for doing exactly what Sammantha did: standing silently by as another confined AD inside the footlocker." But any inconsistency with Sorrentino's statements is unclear. The first question seemed to invite the jury to conclude that the "horrible picture" being painted of Judith was merely a defense tactic to distract from Sammantha's culpability. But even if Sorrentino blamed Judith for not ending A.D.'s abuse, her statements were not inconsistent with the

prosecutor's suggestion here that the defense used Judith's conduct to distract from Sammantha's culpability. And the second statement was accurate: there was no evidence that Judith abused *her* children like Sammantha abused A.D.

¶188 Finally, Sammantha alleges the prosecutor took a position inconsistent with Sorrentino's during the penalty phase when he argued that there was a dearth of evidence that Sammantha's family would relocate whenever they fell under the scrutiny of a state's child protective services ("CPS"). The prosecutor, commenting on a witness' recorded statement, said: "And then there's another attempt at manipulation when the clip of . . . Rebecca Wartman's husband, Robert, saying, quote, 'if they got an impression that maybe CPS or someone was looking at them, they would move.'" The prosecutor continued: "the implication is that CPS investigated the family in all of those places or got reports about them in all of those places, so they moved all those different times. There has been absolutely no evidence to support that insinuation." Sammantha notes that Sorrentino asserted at Cynthia and Judith's sentencing that the family would move to evade CPS investigation in other states. Even if the statements were inconsistent, Sammantha does not explain how such an inconsistent position on an ancillary matter prejudiced her or affected her sentence. Sammantha is not entitled to relief.

## R. Alleged Prosecutorial Misconduct

¶189 Sammantha argues that the State violated her Eighth Amendment rights by inviting the jury to disregard relevant mitigating evidence through inappropriate and inaccurate statements during the penalty phase. Because Sammantha did not object to the alleged misconduct during the penalty phase, we review only for fundamental error. *See State v. (Gilbert) Martinez*, 230 Ariz. 208, 215 ¶ 31 (2012).

¶190 Sammantha contends that the prosecutor made six individual or types of statements during the penalty phase that violated the mitigation standards set by *Lockett* and *Eddings* and, thus, her Eighth Amendment rights. During the penalty phase of a capital trial, a defendant may present, and the jury must consider, any relevant mitigation factors including "any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." § 13-751(G); *State v. Smith*, 250 Ariz. 69, 95 ¶ 118 (2020).

## 1.  Comments on Video Clips

**¶191**        First, Sammantha argues that the State violated *Lockett* and *Eddings* by emphasizing that she presented video clips of witnesses rather than live testimony during the penalty phase.  Sammantha claims that the State violated her constitutional rights when the prosecutor told the jury "there was no opportunity to ask clarifying questions" and "[y]ou are just stuck with whatever is in that clip," effectively challenging the credibility of her witnesses.

**¶192**        Generally, it "is highly inappropriate for a prosecutor to convey his or her personal belief about the credibility of a witness." *State v. Acuna Valenzuela*, 245 Ariz. 197, 216 ¶ 71 (2018) (quoting (*Gilbert*) *Martinez*, 230 Ariz. at 215 ¶ 30).  In *Acuna Valenzuela*, we held that the prosecutor's two comments that a witness' testimony was "not true" were improper. *Id.* at 217 ¶ 72; *see also State v. Moore*, 112 Ariz. 271, 275 (1975) (disapproving of prosecutor's comment that "[t]he state feels that someone or a number of people have lied").  But we have never held that a comment on the medium in which the testimony is delivered is impermissible. *Cf. State v. McCall*, 160 Ariz. 119, 124 (1989) (concluding that it was permissible for a trial court to comment that a defendant's allocution statement was not subject to cross-examination because it was simply acknowledging that the court was the "sole assessor of the credibility" of those statements).

**¶193**        Although the prosecutor invited the jury to question the credibility of the recorded statements, she did not directly express her opinion about the witnesses' testimony or suggest that the witnesses were lying.  Rather, more akin to the judge in *McCall*, she merely noted the limited information available to the jury because the witnesses' recorded testimony was not subject to cross-examination.  Further, the final jury instructions stated: "you should consider what testimony to accept and what to reject [and] may accept everything a witness says, or part of it, or none of it."  Thus, no fundamental error occurred.

## 2.  Inviting the Jury to Disregard Mitigating Evidence

**¶194**        Second, Sammantha contests the prosecutor's following statement during closing: "If you find that a fact or circumstance has been proven but you don't find that it calls for leniency or reduces the

defendant's moral culpability for [A.D.'s] murder, then that fact isn't mitigating, and you don't consider it any further."   She argues that this comment, in combination with the following additional comments, improperly "enticed the jury to disregard uncontested, proven mitigation as irrelevant":

1.  "[H]ow does the fact that she had a miscarriage . . . reduce her moral culpability for [A.D.'s] murder? It doesn't. It has absolutely nothing to do with it."

2.  "So what does [the fact that Sammantha previously kept her kids and house clean] have to do with [A.D.] and what the defendant did to her?"

3.  "The defendant's family moved a lot. And exactly what does that have to do with padlocking [A.D.] in a box?"

4.  "What does [Sammantha's good conduct while in jail pending trial] have to do with locking [A.D.] in a box?"

5.  "That she's not going to pose a danger to anybody in the department of corrections; she's not going to pose a danger to children. . . .   [H]ow does that, in any way, mitigate what she did?"

**¶195**   Sammantha argues that these statements violated the Eighth Amendment because *all* mitigating evidence is relevant even if unrelated to the crime.   Relying on *California v. Brown*, 479 U.S. 538, 546 (1987) (O'Connor, J., concurring), Sammantha correctly notes that we should consider the jury instructions and the prosecutor's comments to determine if any ambiguity existed as to the factors that the jury considered.

**¶196**   In *State v. Villalobos*, 225 Ariz. 74, 82–83 ¶¶ 37–40 (2010), we addressed a similar claim.   There, the prosecutor made numerous "what does it have to do with . . ." comments during mitigation that the defendant argued improperly implied a requisite causal nexus between mitigating evidence and the crime.   *Id.* ¶ 37.   We noted that, although no causal nexus is ever required, "there is no constitutional prohibition against the State arguing that evidence is not particularly relevant or that it is entitled to little weight."   *Id.* at 83 ¶ 38 (quoting *State v. Anderson*, 210 Ariz. 327, 350 ¶ 97

(2005)); *see also State v. Pandeli* (*Pandeli I*), 215 Ariz. 514, 526 ¶ 32 (2007) (approving a prosecutor's comments because "the State never told jurors that they could not consider mitigation unrelated to the crime; it merely suggested that such mitigation was entitled to minimal weight"). Thus, the State's comments here were not improper.

¶197        Further, we have held that proper jury instructions can remedy errors in a prosecutor's penalty phase closing statement. *Pandeli I*, 215 Ariz. at 526 ¶ 33. Here, the jury instructions in the penalty phase stated, in relevant part:

> Mitigating circumstances may be offered by the Defendant or State or be apparent from the evidence presented at any phase of these proceedings. You are *not required to find that there is a connection* between a mitigating circumstance and the crime committed in order to consider the mitigation evidence. Any connection or lack of connection may impact the quality and strength of the mitigation evidence.

(Emphasis added.) Thus, even if the prosecutor's statements improperly suggested a causal nexus requirement, the jury instructions clarified that the jury may not disregard *any* mitigating evidence.

### 3. Misstating the Mitigation Standard

¶198        During closing, the prosecutor told the jury that "[i]f you find a fact or circumstance that was offered to be nothing more than an excuse or a justification for the murder, then it isn't mitigating." Sammantha contends that this statement conflicts with the jury instructions' guidance that "[m]itigating circumstances are not an excuse or justification for the offense but are factors that in fairness and mercy may reduce the defendant's moral culpability." Thus, the statement violated *Lockett* and *Eddings* because it confused the instruction.

¶199        Although the statement may have rephrased the jury instruction's standard, it did not necessarily conflict with the instructions' clarification that mitigating circumstances are *not* an excuse or justification for the crime. Because this Court has approved these instructions, *see State v. Kuhs*, 223 Ariz. 376, 386–87 ¶¶ 53–55 (2010), and in light of the jury's other instructions on mitigation, there was no error.

### 4. Comment on Severity of Life Sentence

**¶200** Sammantha argues that the State improperly suggested that the jury could not consider the severity of the sentences:

> Now, an example of something that you can't consider as mitigation would be a juror's personal opinion that life in prison is a more severe punishment than the death penalty. Well, just *believing that life in prison is the worst punishment* has nothing to do with the defendant's character, propensities, history or record, or circumstances of the offense. Nothing. It's just a personal opinion. So since it isn't based on anything about the defendant, it can't be used to give the defendant a life sentence, and it *can't be a mitigating factor*.

(Emphasis added.)

**¶201** Although a defendant is entitled to present any relevant mitigating evidence, relevance is limited to "any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." § 13-751(G). Without the relevance limitation, defense counsel would be permitted to urge the jury to conclude that a life sentence is harsher than the death penalty rather than focusing on the defendant. However, the jury was instructed that: "Mitigating circumstances are any factors that are a basis for a life sentence instead of a death sentence, so long as they relate to any sympathetic or other aspect of the *defendant's* character, propensity, history or record, or circumstances of the offense." (Emphasis added.) The prosecutor's statement and the instructions accurately state the law. *See State v. Prince* (*Prince II*), 226 Ariz. 516, 536–37 ¶¶ 78–80 (2011). There was no error.

### 5. Weighing Mitigation Against Aggravating Factors and the Crime

**¶202** Sammantha argues that the State impermissibly invited the jury to weigh the mitigating evidence against the aggravating factors and circumstances of the crime. Although she acknowledges that the circumstances of the offense can be considered in mitigation, she appears to argue that the jury must ignore the aggravating factors. The jury

instructions stated: "In reaching a reasoned, moral judgment about which sentence is justified and appropriate, you must decide how compelling or persuasive the totality of the mitigating factors [is] when evaluated in connection with the totality of the aggravating factors and the facts and circumstances of the case." We have previously approved these instructions and rejected this argument. (*Michael J.*) *Carlson*, 237 Ariz. at 396 ¶¶ 51–54 (noting that although the state cannot argue a new aggravating circumstance, it can argue any circumstances that rebut mitigation). No error occurred.

### 6.  Inaccurate Arguments and Inferences

**¶203**       Sammantha argues that the State impermissibly suggested that she personally killed A.D. and that the murder "took countless hours to accomplish." Prosecutors may raise inferences based on the record during closing arguments. *See Goudeau*, 239 Ariz. at 466 ¶ 196 (describing the "wide latitude" prosecutors have during closing argument to summarize evidence, urge the jury to draw inferences, and suggest conclusions); *Riley*, 248 Ariz. at 191–92 ¶¶ 148–50.

**¶204**       Regarding the suggestion that Sammantha personally killed A.D., the State argues that the record reflects that she and John worked in tandem in forcing A.D. into the box. *See supra* ¶ 139. Sammantha cites to portions of the closing argument, out of context, to allege that the State impermissibly stated that Sammantha personally latched and locked the box. In context, however, the statements are accurate and reflect the State's theory that John and Sammantha acted in concert:

- "We're here because . . . the defendant and John Allen put a little girl in a box. . . .  It was latched, and then this lock was put on it."

- A.D. "was totally helpless to resist the defendant and John Allen's actions. . . . [T]hey made sure she couldn't escape the confines of the box by putting a lock on it.  And they took the key in the event that somebody in the house came across [A.D.] in the box."

- "John Allen, with the defendant right there, told [A.D.] to go outside and get the box."

- "And the most offensive and illustrative thing that you know about the defendant's character is when she and John Allen suggested . . . that it was C.J. who latched [A.D.] into the box. They knew what they had done, but they were willing to let a 12-year-old little girl take the blame for that."

**¶205**     Further, the record reflected that the abuse resulting in A.D.'s murder *did* take hours to accomplish, given that the backbends started as early as 7:30 p.m. and A.D.'s body was not discovered until the following morning. Thus, these statements did not misstate the record. No error occurred.

**¶206**     Finally, Sammantha argues that the collective effect of the State's allegedly improper comments enticed the jury to disregard all the mitigating evidence in violation of the Eighth Amendment. Because no error occurred, Sammantha's constitutional rights were not violated, and she is not entitled to relief.

### S. Arizona's Standard of Review for Capital Sentences

**¶207**     Sammantha contends that Arizona's abuse of discretion standard for death sentences provides no meaningful review and thus fails to satisfy Eighth Amendment standards. The State counters that reviewing capital sentences under this standard is constitutional. Whether A.R.S. § 13-756(A) violates the Eighth Amendment is an issue of law we review de novo. *State v. (Cody J.) Martinez*, 218 Ariz. 421, 434 ¶ 59 (2008).

**¶208**     Although "we have already determined that abuse of discretion review [for death sentences] is constitutional," *State v. Cota*, 229 Ariz. 136, 153 ¶ 92 (2012) (citing (*Cody J.*) *Martinez*, 218 Ariz. at 434 ¶¶ 61–62), Sammantha contends that "no case addresses [her] argument." To bolster this claim, she mischaracterizes her facial challenge as an "as applied" challenge.

**¶209**     Sammantha asserts that "A.R.S. § 13-756(A) is unconstitutional as applied," but she actually raises a facial challenge, contending that "Arizona rejects necessity of a record evidencing the mitigating factors jurors found proven *and* a record revealing factors

actually considered. Knowing this, prosecutors argue with impunity proven mitigation should be disregarded. On review, defendants are powerless to demonstrate the impact of such unconstitutional arguments." Sammantha's reference to "defendants" and Arizona's general approach reveals the facial nature of her challenge, as does her failure to focus on the absence of a mitigation record in her case. Thus, Sammantha argues that "[a]lthough the duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case, and review by courts at every level helps to ensure reliability, Arizona's standard of review incapacitates both Eighth Amendment goals."

¶210        We have repeatedly rejected facial challenges to § 13-756(A). *See, e.g., Cota*, 229 Ariz. at 153 ¶¶ 91–92 (holding that § 13-756(A)'s abuse of discretion standard provides meaningful review of death sentences). As we reasoned in *Cota*, "[m]eaningful appellate review requires only that an appellate court 'consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed,' not whether the appellate court itself would have imposed a death sentence." *Id.* ¶ 92 (quoting *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990)). Sammantha does not identify any recent jurisprudential shift, and she provides no reason otherwise for us to revisit this issue.

## T. Alleged Imposition of Illegal Sentences on All Non-Capital Counts

¶211        Sammantha argues that the aggravating factors were insufficient as a matter law for each of the four noncapital counts. Thus, she argues that we must remand for resentencing because the trial court committed fundamental error. The State concedes that the aggravated sentence on Count 4 constituted fundamental error. The imposition of an illegal sentence constitutes fundamental error that requires us to remand for resentencing. *See Allen*, 248 Ariz. at 367 ¶ 58.

¶212        After determining that Sammantha should be sentenced to death for Count 1, the jury found the following aggravators proven with respect to each of the noncapital counts:

- Count 2: Conspiracy to Commit Child Abuse: (1) the defendant committed the offense in an especially cruel

      manner, (2) age of the victim, and (3) the defendant was in a position of trust.

- Count 3: Intentional or Knowing Child Abuse (locking A.D. in box overnight): (1) the offense involved the presence of an accomplice, (2) the defendant committed the offense in an especially cruel manner, and (3) the defendant was in a position of trust.

- Count 4: Negligent Child Abuse: (1) the offense involved the presence of an accomplice.

- Count 5: Intentional or Knowing Child Abuse (first time Kassandrea saw the abuse): (1) the defendant committed the offense in an especially cruel manner, and (2) the defendant was in a position of trust.

The court imposed the following maximum sentences for Counts 2, 3, and 5: Count 2, fifteen years (to be served consecutively to Counts 4 and 5); Count 3, thirty-five years (to be served consecutively to Count 2); and Count 5, twenty-four years (to be served consecutively to Count 4). The court imposed an aggravated sentence of two years on Count 4 to be served concurrently to the other counts. The sentences were to commence on August 7, 2017, and Sammantha was credited with 2,203 days of presentence incarceration.

**¶213** Section 13-705 provides the minimum, presumptive, and maximum sentences for dangerous crimes against children. To impose a maximum sentence, at least one aggravator must be found, A.R.S. § 13-701(C), but to impose an aggravated sentence, at least two aggravating circumstances must be found for a first-time offender, § 13-702(C). The relevant statute lists twenty-six "specific" aggravating factors, § 13-701(D)(1)–(26), and one "catch-all" factor which may include "[a]ny other factor that the state alleges is relevant to the defendant's character or background or to the nature or circumstances of the crime," § 13-701(D)(27). The specific aggravators include the presence of an accomplice, § 13-701(D)(4), and commission of the crime in an especially cruel manner, § 13-701(D)(5).

**¶214** "A maximum or aggravated sentence cannot be based solely on one or more 'catch-all' aggravators because doing so would violate due process. The 'catch-all' aggravator is 'patently vague' and would 'give[] the sentencing court virtually unlimited post hoc discretion . . . .'" *Allen*, 248 Ariz. at 368 ¶ 63 (quoting *State v. Schmidt*, 220 Ariz. 563, 566 ¶¶ 9–10 (2009)). Thus, to impose a maximum sentence, at least one enumerated, specific aggravator must be found before a court may rely on the "catch-all" aggravator provision. *State v. Bonfiglio*, 231 Ariz. 371, 372 ¶ 1 (2013). Similarly, to impose an aggravated sentence, at least two enumerated, specific aggravators must be found before a court may rely on the "catch-all" aggravator provision. *See Allen*, 248 Ariz. at 369 ¶ 68.

### 1. Presence of an Accomplice Aggravator (Counts 3 and 4)

**¶215** Sammantha first argues that because the jury was not instructed on accomplice liability, it could not find the "presence of an accomplice" aggravator for Counts 3 and 4. The State argues that no error occurred for at least two reasons. First, in *State v.* (*Therron A.*) *Johnson*, 131 Ariz. 299, 303 (1982), we noted that the inquiry for this aggravator involves "not whether the coparticipant could be held liable as an accomplice," but instead requires a finding that either "the dangerous nature of the offense was increased because of the actual presence or participation of multiple perpetrators" or the "defendant believed he was acting in concert with another." Second, the State correctly notes that we have recognized that juries understand "accomplice" based on the plain meaning of the word. *See Avila*, 147 Ariz. at 338. Because the jury only needed to find the *presence* of an accomplice and not *liability* based on the actions of an accomplice, an accomplice liability instruction was not required to find this aggravator. Moreover, if the liability instruction was required, any error was harmless because the "presence" of both Sammantha and John is not disputed during the commission of the Count 3 and 4 offenses.

### 2. Especially Cruel Aggravator (Counts 2, 3, and 5)

**¶216** Sammantha also argues that the "especially cruel" findings for Counts 2, 3, and 5 were insufficient. As to Count 2, she contends that a preparatory offense such as conspiracy cannot be committed in an especially cruel manner because conspiracy involves only the agreement to commit a crime; such an agreement cannot be cruel. She fails to cite any

authority to support this proposition. In John's case, we addressed a related argument and noted that the jury's cruelty finding for the murder did not necessarily imply it would have also found cruelty on the conspiracy charge, an inchoate crime. *Allen*, 248 Ariz. at 368–69 ¶ 66. Here, however, the jury expressly found that the conspiracy was committed in an especially cruel manner. Although we do not know why the jury found this aggravator, it simply may have concluded that Sammantha's conspiring with John to subject a child to rigorous physical activity before locking her in a box to asphyxiate was especially cruel. Thus, Sammantha is not entitled to relief on this issue.

¶217 As to Counts 3 and 5, Sammantha argues that the cruelty aggravator is unsupported because there is no evidence that A.D. suffered. As noted by the State and discussed at length, *supra* ¶¶ 154–58, there was sufficient evidence to show that A.D. experienced considerable suffering.

### 3. Position of Trust and Age of Victim (Counts 3 and 5)

¶218 Finally, Sammantha argues that the unenumerated aggravators—the age of the victim and position of trust—cannot be used because at least one enumerated factor must be found before any "catch-all" factor can be considered, and she alleges neither enumerated factor found was sufficient. Because there was sufficient evidence to support both the enumerated factors—accomplice and especially cruel—Sammantha's argument lacks merit.

### 4. Illegal Sentences

¶219 As to Count 3, Sammantha argues that this sentence was illegal because (1) the conviction alone violated double jeopardy, and (2) if the two enumerated factors are insufficient, the sole remaining unenumerated factor cannot be used to support an aggravated sentence. As discussed, *supra* ¶¶ 164–65, the conviction did not violate jeopardy, and because both the enumerated factors—accomplice and especially cruel— were properly found by the jury, this sentence was legal.

¶220 As to Count 4, the State concedes that because only one aggravating factor was found, the imposition of an aggravated sentence was illegal. Because an illegal sentence constitutes fundamental error, we

vacate the sentence on Count 4 and remand to the trial court for resentencing on that count.

**¶221** As to Counts 2 and 5, Sammantha argues that if the especially cruel factor was improper, the remaining two "catch-all" factors were insufficient to aggravate the sentence. But, as noted, the jury's cruelty finding was supported by the record. Thus, because the jury properly found the cruelty factor and at least one catch-all aggravator for each count, the aggravated sentences on Counts 2 and 5 were legal.

**¶222** Thus, we vacate the sentence for Count 4 and remand for resentencing.[10]

### U. Abuse of Discretion Review for Jury's Imposition of Death Sentence

**¶223** Arizona law mandates that this Court review "all death sentences to determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death." § 13-756(A); *see State v.* (*Cory D.*) *Morris*, 215 Ariz. 324, 340 ¶ 76 (2007). Consequently, we must determine whether the jury abused its discretion in finding that death is the appropriate sentence for A.D.'s murder.

**¶224** Even when a defendant does not raise the issue, "we must review the jury's finding of aggravating circumstances and the imposition of a death sentence for abuse of discretion, viewing the facts in the light

---

[10] Sammantha also alleges that because conspiracy is not a Dangerous Crime Against Children ("DCAC") offense, the trial court erroneously invoked the DCAC statute and imposed consecutive sentences. "A dangerous crime against children is in the first degree if it is a completed offense and is in the second degree if it is a preparatory offense . . . ." § 13-705(P). As we noted in John's case, John was convicted "for conspiracy, a preparatory offense under § 13-1003, to commit child abuse, an enumerated [DCAC]." *Allen*, 248 Ariz. at 367 ¶ 60; *see also Wright v. Gates*, 243 Ariz. 118, 121 ¶ 11 (2017) ("[A] preparatory offense . . . in furtherance of an enumerated DCAC offense, is punishable under the DCAC statute."). Thus, the trial court properly invoked the DCAC statute.

most favorable to sustaining the verdict." *State v. Gunches*, 240 Ariz. 198, 207 ¶ 41 (2016) (internal citation omitted). We first review the jury's finding of aggravating circumstances, and "we uphold a decision if there is 'any reasonable evidence in the record to sustain it.'" (*Cory D.*) *Morris*, 215 Ariz. at 340–41 ¶ 77 (quoting *State v. Veatch*, 132 Ariz. 394, 396 (1982)). We next consider the jury's imposition of a death sentence and "will not reverse the jury's decision so long as any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency." *Id.* at 341 ¶ 81.

**¶225** "The decision to impose the death penalty once the jury finds aggravating factors is a matter for each individual juror to consider." *Id.* Here, the jurors did not abuse their discretion. As discussed, *supra* ¶¶ 150–65, substantial evidence supported three aggravating factors. Additionally, a reasonable jury could have found that Sammantha's mitigation—consisting primarily of details regarding her upbringing—was not sufficiently substantial to call for leniency. Because a reasonable jury could have determined that death was warranted, the jury did not abuse its discretion in finding that death was the appropriate sentence for A.D.'s murder.

## V. Issued Raised to Avoid Preclusion

**¶226** Sammantha identifies twelve issues she seeks to preserve for federal review. We have previously rejected each of these claims and decline to revisit them.

## CONCLUSION

**¶227** We affirm Sammantha's convictions and the imposition of the death sentence for Count 1, felony murder, and the sentences for Counts 2, 3, and 5. However, the sentence imposed for Count 4 was illegal, and we remand to the trial court for resentencing on that count.